# THORNBURG, ATTORNEY GENERAL OF NORTH CAROLINA, ET AL. *v.* GINGLES ET AL.

No. 83–1968.   Argued December 4, 1985—Decided June 30, 1986

BRENNAN, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–A, III–B, IV–A, and V, in which WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined, an opinion with respect to Part III–C, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined, and an opinion with respect to Part IV–B, in which WHITE, J., joined. WHITE, J., filed a concurring opinion, *post*, p. 82. O'CONNOR, J., filed an opinion concurring in the judgment, in which BURGER, C. J., and POWELL and REHNQUIST, JJ., joined, *post*, p. 83. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 106.

*Lacy H. Thornburg*, Attorney General of North Carolina, *pro se*, argued the cause for appellants. With him on the briefs were *Jerris Leonard*, *Kathleen Heenan McGuan*, *James Wallace, Jr.*, Deputy Attorney General for Legal Affairs, and *Tiare B. Smiley* and *Norma S. Harrell*, Assistant Attorneys General.

*Solicitor General Fried* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Assistant Attorney General Reynolds* and *Deputy Assistant Attorney General Cooper*.

*Julius LeVonne Chambers* argued the cause for appellees. With him on the briefs for appellees Gingles et al. were *Eric Schnapper*, *C. Lani Guinier*, and *Leslie J. Winner*. *C. Allen Foster*, *Kenneth J. Gumbiner*, *Robert N.*

*Hunter, Jr.*, and *Arthur J. Donaldson* filed briefs for appellees Eaglin et al.*

JUSTICE BRENNAN announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–A, III–B, IV–A, and V, an opinion with respect to Part III–C, in which JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, and an opinion with respect to Part IV–B, in which JUSTICE WHITE joins.

This case requires that we construe for the first time § 2 of the Voting Rights Act of 1965, as amended June 29, 1982. 42 U. S. C. § 1973. The specific question to be decided is whether the three-judge District Court, convened in the Eastern District of North Carolina pursuant to 28 U. S. C. § 2284(a) and 42 U. S. C. § 1973c, correctly held that the use in a legislative redistricting plan of multimember districts in five North Carolina legislative districts violated § 2 by impairing the opportunity of black voters "to participate in the political process and to elect representatives of their choice." § 2(b), 96 Stat. 134.

I

BACKGROUND

In April 1982, the North Carolina General Assembly enacted a legislative redistricting plan for the State's Senate

---

*Daniel J. Popeo* and *George C. Smith* filed a brief for the Washington Legal Foundation as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union Foundation, Inc., et al. by *Cynthia Hill, Maureen T. Thornton, Laughlin McDonald*, and *Neil Bradley;* for Common Cause by *William T. Lake;* for the Lawyer's Committee for Civil Rights Under Law et al. by *James Robertson, Harold R. Tyler, Jr., Norman Redlich, William L. Robinson, Frank R. Parker, Samuel Rabinove*, and *Richard T. Foltin;* for James G. Martin, Governor of North Carolina, by *Victor S. Friedman;* for Legal Services of North Carolina by *David H. Harris, Jr., Susan M. Perry, Richard Taylor*, and *Julian Pierce;* for the Republican National Committee by *Roger Allan Moore* and *Michael A. Hess;* and for Senator Dennis DeConcini et al. by *Walter J. Rockler.*

and House of Representatives. Appellees, black citizens of North Carolina who are registered to vote, challenged seven districts, one single-member[1] and six multimember[2] districts, alleging that the redistricting scheme impaired black citizens' ability to elect representatives of their choice in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution and of § 2 of the Voting Rights Act.[3]

After appellees brought suit, but before trial, Congress amended § 2. The amendment was largely a response to this Court's plurality opinion in *Mobile* v. *Bolden*, 446 U. S. 55 (1980), which had declared that, in order to establish a violation either of § 2 or of the Fourteenth or Fifteenth Amendments, minority voters must prove that a contested electoral mechanism was intentionally adopted or maintained by state officials for a discriminatory purpose. Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the "results test," applied by this Court in *White* v. *Regester*, 412 U. S. 755 (1973), and by other federal courts before *Bolden*, *supra*. S. Rep. No. 97–417, p. 28 (1982) (hereinafter S. Rep.).

---

[1] Appellees challenged Senate District No. 2, which consisted of the whole of Northampton, Hertford, Gates, Bertie, and Chowan Counties, and parts of Washington, Martin, Halifax, and Edgecombe Counties.

[2] Appellees challenged the following multimember districts: Senate No. 22 (Mecklenburg and Cabarrus Counties—four members), House No. 36 (Mecklenburg County—eight members), House No. 39 (part of Forsyth County—five members), House No. 23 (Durham County—three members), House No. 21 (Wake County—six members), and House No. 8 (Wilson, Nash, and Edgecombe Counties—four members).

[3] Appellants initiated this action in September 1981, challenging the North Carolina General Assembly's July 1981 redistricting. The history of this action is recounted in greater detail in the District Court's opinion in this case, *Gingles* v. *Edmisten*, 590 F. Supp. 345, 350–358 (EDNC 1984). It suffices here to note that the General Assembly revised the 1981 plan in April 1982 and that the plan at issue in this case is the 1982 plan.

Section 2, as amended, 96 Stat. 134, reads as follows:

"(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

"(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." Codified at 42 U. S. C. § 1973.

The Senate Judiciary Committee majority Report accompanying the bill that amended § 2 elaborates on the circumstances that might be probative of a § 2 violation, noting the following "typical factors": [4]

"1. the extent of any history of official discrimination in the state or political subdivision that touched the right of

---

[4] These factors were derived from the analytical framework of *White* v. *Regester*, 412 U. S. 755 (1973), as refined and developed by the lower courts, in particular by the Fifth Circuit in *Zimmer* v. *McKeithen*, 485 F. 2d 1297 (1973) (en banc), aff'd *sub nom. East Carroll Parish School Board* v. *Marshall*, 424 U. S. 636 (1976) *(per curiam).* S. Rep., at 28, n. 113.

the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

"2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

"3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

"4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

"5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

"6. whether political campaigns have been characterized by overt or subtle racial appeals;

"7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

"Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

"whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

"whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." S. Rep., at 28–29.

The District Court applied the "totality of the circumstances" test set forth in § 2(b) to appellees' statutory claim, and, relying principally on the factors outlined in the Senate

Report, held that the redistricting scheme violated § 2 because it resulted in the dilution of black citizens' votes in all seven disputed districts. In light of this conclusion, the court did not reach appellees' constitutional claims. *Gingles* v. *Edmisten*, 590 F. Supp. 345 (EDNC 1984).

Preliminarily, the court found that black citizens constituted a distinct population and registered-voter minority in each challenged district. The court noted that at the time the multimember districts were created, there were concentrations of black citizens within the boundaries of each that were sufficiently large and contiguous to constitute effective voting majorities in single-member districts lying wholly within the boundaries of the multimember districts. With respect to the challenged single-member district, Senate District No. 2, the court also found that there existed a concentration of black citizens within its boundaries and within those of adjoining Senate District No. 6 that was sufficient in numbers and in contiguity to constitute an effective voting majority in a single-member district. The District Court then proceeded to find that the following circumstances combined with the multimember districting scheme to result in the dilution of black citizens' votes.

*First,* the court found that North Carolina had officially discriminated against its black citizens with respect to their exercise of the voting franchise from approximately 1900 to 1970 by employing at different times a poll tax, a literacy test, a prohibition against bullet (single-shot) voting,[5]

---

[5] Bullet (single-shot) voting has been described as follows:

" 'Consider [a] town of 600 whites and 400 blacks with an at-large election to choose four council members. Each voter is able to cast four votes. Suppose there are eight white candidates, with the votes of the whites split among them approximately equally, and one black candidate, with all the blacks voting for him and no one else. The result is that each white candidate receives about 300 votes and the black candidate receives 400 votes. The black has probably won a seat. This technique is called single-shot voting. Single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if

and designated seat plans [6] for multimember districts. The court observed that even after the removal of direct barriers to black voter registration, such as the poll tax and literacy test, black voter registration remained relatively depressed; in 1982 only 52.7% of age-qualified blacks statewide were registered to vote, whereas 66.7% of whites were registered. The District Court found these statewide depressed levels of black voter registration to be present in all of the disputed districts and to be traceable, at least in part, to the historical pattern of statewide official discrimination.

*Second,* the court found that historic discrimination in education, housing, employment, and health services had resulted in a lower socioeconomic status for North Carolina blacks as a group than for whites. The court concluded that this lower status both gives rise to special group interests and hinders blacks' ability to participate effectively in the political process and to elect representatives of their choice.

*Third,* the court considered other voting procedures that may operate to lessen the opportunity of black voters to elect candidates of their choice. It noted that North Carolina has a majority vote requirement for primary elections and, while acknowledging that no black candidate for election to the State General Assembly had failed to win solely because of this requirement, the court concluded that it nonetheless presents a continuing practical impediment to the opportunity of black voting minorities to elect candidates of their choice. The court also remarked on the fact that North Carolina does not have a subdistrict residency requirement for members of the General Assembly elected from multimember

the vote of the majority is divided among a number of candidates.'" *City of Rome* v. *United States,* 446 U. S. 156, 184, n. 19 (1980), quoting United States Commission on Civil Rights, The Voting Rights Act: Ten Years After, pp. 206–207 (1975).

[6] Designated (or numbered) seat schemes require a candidate for election in multimember districts to run for specific seats, and can, under certain circumstances, frustrate bullet voting. See, *e. g., City of Rome, supra,* at 185, n. 21.

districts, a requirement which the court found could offset to some extent the disadvantages minority voters often experience in multimember districts.

*Fourth*, the court found that white candidates in North Carolina have encouraged voting along color lines by appealing to racial prejudice. It noted that the record is replete with specific examples of racial appeals, ranging in style from overt and blatant to subtle and furtive, and in date from the 1890's to the 1984 campaign for a seat in the United States Senate. The court determined that the use of racial appeals in political campaigns in North Carolina persists to the present day and that its current effect is to lessen to some degree the opportunity of black citizens to participate effectively in the political processes and to elect candidates of their choice.

*Fifth*, the court examined the extent to which blacks have been elected to office in North Carolina, both statewide and in the challenged districts. It found, among other things, that prior to World War II, only one black had been elected to public office in this century. While recognizing that "it has now become possible for black citizens to be elected to office at all levels of state government in North Carolina," 590 F. Supp., at 367, the court found that, in comparison to white candidates running for the same office, black candidates are at a disadvantage in terms of relative probability of success. It also found that the overall rate of black electoral success has been minimal in relation to the percentage of blacks in the total state population. For example, the court noted, from 1971 to 1982 there were at any given time only two-to-four blacks in the 120-member House of Representatives—that is, only 1.6% to 3.3% of House members were black. From 1975 to 1983 there were at any one time only one or two blacks in the 50-member State Senate—that is, only 2% to 4% of State Senators were black. By contrast, at the time of the District Court's opinion, blacks constituted about 22.4% of the total state population.

With respect to the success in this century of black candidates in the contested districts, see also Appendix B to opinion, *post*, p. 82, the court found that only one black had been elected to House District 36—after this lawsuit began. Similarly, only one black had served in the Senate from District 22, from 1975–1980. Before the 1982 election, a black was elected only twice to the House from District 39 (part of Forsyth County); in the 1982 contest two blacks were elected. Since 1973 a black citizen had been elected each 2-year term to the House from District 23 (Durham County), but no black had been elected to the Senate from Durham County. In House District 21 (Wake County), a black had been elected twice to the House, and another black served two terms in the State Senate. No black had ever been elected to the House or Senate from the area covered by House District No. 8, and no black person had ever been elected to the Senate from the area covered by Senate District No. 2.

The court did acknowledge the improved success of black candidates in the 1982 elections, in which 11 blacks were elected to the State House of Representatives, including 5 blacks from the multimember districts at issue here. However, the court pointed out that the 1982 election was conducted after the commencement of this litigation. The court found the circumstances of the 1982 election sufficiently aberrational and the success by black candidates too minimal and too recent in relation to the long history of complete denial of elective opportunities to support the conclusion that black voters' opportunities to elect representatives of their choice were not impaired.

*Finally*, the court considered the extent to which voting in the challenged districts was racially polarized. Based on statistical evidence presented by expert witnesses, supplemented to some degree by the testimony of lay witnesses, the court found that all of the challenged districts exhibit severe and persistent racially polarized voting.

Based on these findings, the court declared the contested portions of the 1982 redistricting plan violative of § 2 and enjoined appellants from conducting elections pursuant to those portions of the plan.  Appellants, the Attorney General of North Carolina and others, took a direct appeal to this Court, pursuant to 28 U. S. C. § 1253, with respect to five of the multimember districts—House Districts 21, 23, 36, and 39, and Senate District 22.  Appellants argue, first, that the District Court utilized a legally incorrect standard in determining whether the contested districts exhibit racial bloc voting to an extent that is cognizable under § 2.  Second, they contend that the court used an incorrect definition of racially polarized voting and thus erroneously relied on statistical evidence that was not probative of polarized voting.  Third, they maintain that the court assigned the wrong weight to evidence of some black candidates' electoral success.  Finally, they argue that the trial court erred in concluding that these multimember districts result in black citizens having less opportunity than their white counterparts to participate in the political process and to elect representatives of their choice.  We noted probable jurisdiction, 471 U. S. 1064 (1985), and now affirm with respect to all of the districts except House District 23.  With regard to District 23, the judgment of the District Court is reversed.

## II

## SECTION 2 AND VOTE DILUTION THROUGH USE OF MULTIMEMBER DISTRICTS

An understanding both of § 2 and of the way in which multimember districts can operate to impair blacks' ability to elect representatives of their choice is prerequisite to an evaluation of appellants' contentions.  First, then, we review amended § 2 and its legislative history in some detail.  Second, we explain the theoretical basis for appellees' claim of vote dilution.

## A
## SECTION 2 AND ITS LEGISLATIVE HISTORY

Subsection 2(a) prohibits all States and political subdivisions from imposing *any* voting qualifications or prerequisites to voting, or any standards, practices, or procedures which result in the denial or abridgment of the right to vote of any citizen who is a member of a protected class of racial and language minorities. Subsection 2(b) establishes that § 2 has been violated where the "totality of circumstances" reveal that "the political processes leading to nomination or election . . . are not equally open to participation by members of a [protected class] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." While explaining that "[t]he extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered" in evaluating an alleged violation, § 2(b) cautions that "nothing in [§ 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

The Senate Report which accompanied the 1982 amendments elaborates on the nature of § 2 violations and on the proof required to establish these violations.[7] First and foremost, the Report dispositively rejects the position of the plurality in *Mobile* v. *Bolden*, 446 U. S. 55 (1980), which

---

[7] The United States urges this Court to give little weight to the Senate Report, arguing that it represents a compromise among conflicting "factions," and thus is somehow less authoritative than most Committee Reports. Brief for United States as *Amicus Curiae* 8, n. 12, 24, n. 49. We are not persuaded that the legislative history of amended § 2 contains anything to lead us to conclude that this Senate Report should be accorded little weight. We have repeatedly recognized that the authoritative source for legislative intent lies in the Committee Reports on the bill. See, *e. g.*, *Garcia* v. *United States*, 469 U. S. 70, 76, and n. 3 (1984); *Zuber* v. *Allen*, 396 U. S. 168, 186 (1969).

44

required proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters.[8]  See, e. g., S. Rep., at 2, 15–16, 27.  The intent test was repudiated for three principal reasons — it is "unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities," it places an "inordinately difficult" burden of proof on plaintiffs, and it "asks the wrong question."  *Id.*, at 36. The "right" question, as the Report emphasizes repeatedly, is whether "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice."[9]  *Id.*, at 28.  See also *id.*, at 2, 27, 29, n. 118, 36.

In order to answer this question, a court must assess the impact of the contested structure or practice on minority electoral opportunities "on the basis of objective factors." *Id.*, at 27.  The Senate Report specifies factors which typically may be relevant to a § 2 claim: the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political

---

[8] The Senate Report states that amended § 2 was designed to restore the "results test" — the legal standard that governed voting discrimination cases prior to our decision in *Mobile* v. *Bolden*, 446 U. S. 55 (1980). S. Rep., at 15–16.  The Report notes that in pre-*Bolden* cases such as *White* v. *Regester*, 412 U. S. 755 (1973), and *Zimmer* v. *McKeithen*, 485 F. 2d 1297 (CA5 1973), plaintiffs could prevail by showing that, under the totality of the circumstances, a challenged election law or procedure had the effect of denying a protected minority an equal chance to participate in the electoral process.  Under the "results test," plaintiffs are not required to demonstrate that the challenged electoral law or structure was designed or maintained for a discriminatory purpose.  S. Rep., at 16.

[9] The Senate Committee found that "voting practices and procedures that have discriminatory results perpetuate the effects of past purposeful discrimination."  *Id.*, at 40 (footnote omitted).  As the Senate Report notes, the purpose of the Voting Rights Act was " 'not only to correct an active history of discrimination, the denying to Negroes of the right to register and vote, but also to deal with the accumulation of discrimination.' " *Id.*, at 5 (quoting 111 Cong. Rec. 8295 (1965) (remarks of Sen. Javits)).

subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction. *Id.*, at 28–29; see also *supra*, at 36–37. The Report notes also that evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value. *Id.*, at 29. The Report stresses, however, that this list of typical factors is neither comprehensive nor exclusive. While the enumerated factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims,[10] other factors may also be relevant and may be considered. *Id.*, at 29–30. Furthermore, the Senate Committee observed that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.*, at 29. Rather, the Committee determined that "the question whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality,'" *id.*, at 30 (footnote omitted), and on a "functional" view of the political process. *Id.*, at 30, n. 120.

---

[10] Section 2 prohibits all forms of voting discrimination, not just vote dilution. S. Rep., at 30.

Although the Senate Report espouses a flexible, fact-intensive test for § 2 violations, it limits the circumstances under which § 2 violations may be proved in three ways. First, electoral devices, such as at-large elections, may not be considered *per se* violative of § 2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process. *Id.*, at 16. Second, the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation. *Ibid.* Third, the results test does not assume the existence of racial bloc voting; plaintiffs must prove it. *Id.*, at 33.

## B

## VOTE DILUTION THROUGH THE USE OF MULTIMEMBER DISTRICTS

Appellees contend that the legislative decision to employ multimember, rather than single-member, districts in the contested jurisdictions dilutes their votes by submerging them in a white majority,[11] thus impairing their ability to elect representatives of their choice.[12]

---

[11] Dilution of racial minority group voting strength may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority. Engstrom & Wildgen, Pruning Thorns from the Thicket: An Empirical Test of the Existence of Racial Gerrymandering, 2 Legis. Stud. Q. 465, 465–466 (1977) (hereinafter Engstrom & Wildgen). See also Derfner, Racial Discrimination and the Right to Vote, 26 Vand. L. Rev. 523, 553 (1973) (hereinafter Derfner); F. Parker, Racial Gerrymandering and Legislative Reapportionment (hereinafter Parker), in Minority Vote Dilution 86–100 (Davidson ed., 1984) (hereinafter Minority Vote Dilution).

[12] The claim we address in this opinion is one in which the plaintiffs alleged and attempted to prove that their ability *to elect* the representatives of their choice was impaired by the selection of a multimember electoral structure. We have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in

The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives. This Court has long recognized that multimember districts and at-large voting schemes may " 'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.' " [13] *Burns* v. *Richardson,* 384 U. S.

---

a single-member district, alleging that the use of a multimember district impairs its ability to *influence* elections.

We note also that we have no occasion to consider whether the standards we apply to respondents' claim that multimember districts operate to dilute the vote of geographically cohesive minority groups that are large enough to constitute majorities in single-member districts and that are contained within the boundaries of the challenged multimember districts, are fully pertinent to other sorts of vote dilution claims, such as a claim alleging that the splitting of a large and geographically cohesive minority between two or more multimember or single-member districts resulted in the dilution of the minority vote.

[13] Commentators are in widespread agreement with this conclusion. See, *e. g.,* Berry & Dye, The Discriminatory Effects of At-Large Elections, 7 Fla. St. U. L. Rev. 85 (1979) (hereinafter Berry & Dye); Blacksher & Menefee, From *Reynolds* v. *Sims* to *City of Mobile* v. *Bolden,* 34 Hastings L. J. 1 (1982) (hereinafter Blacksher & Menefee); Bonapfel, Minority Challenges to At-Large Elections: The Dilution Problem, 10 Ga. L. Rev. 353 (1976) (hereinafter Bonapfel); Butler, Constitutional and Statutory Challenges to Election Structures: Dilution and the Value of the Right to Vote, 42 La. L. Rev. 851 (1982) (hereinafter Butler); Carpeneti, Legislative Apportionment: Multimember Districts and Fair Representation, 120 U. Pa. L. Rev. 666 (1972) (hereinafter Carpeneti); Davidson & Korbel, At-Large Elections and Minority Group Representation, in Minority Vote Dilution 65; Derfner; B. Grofman, Alternatives to Single-Member Plurality Districts: Legal and Empirical Issues (hereinafter Grofman, Alternatives), in Representation and Redistricting Issues 107 (B. Grofman, R. Lijphart, H. McKay, & H. Scarrow eds., 1982) (hereinafter Representation and Redistricting Issues); Hartman, Racial Vote Dilution and Separation of Powers, 50 Geo. Wash. L. Rev. 689 (1982); Jewell, The Consequences of Single- and Multimember Districting, in Representation and Redistricting Issues 129 (1982) (hereinafter Jewell); Jones, The Impact of Local Election Systems on Political Representation, 11 Urb. Aff. Q. 345 (1976); Karnig,

73, 88 (1966) (quoting *Fortson* v. *Dorsey*, 379 U. S. 433, 439 (1965)).   See also *Rogers* v. *Lodge*, 458 U. S. 613, 617 (1982); *White* v. *Regester*, 412 U. S., at 765; *Whitcomb* v. *Chavis*, 403 U. S. 124, 143 (1971).   The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters.[14]   See, *e. g.*, Grofman, Alternatives, in Representation and Redistricting Issues 113–114. Multimember districts and at-large election schemes, however, are not *per se* violative of minority voters' rights. S. Rep., at 16.   Cf. *Rogers* v. *Lodge, supra,* at 617; *Regester, supra,* at 765; *Whitcomb, supra,* at 142.   Minority voters who contend that the multimember form of districting violates § 2 must prove that the use of a multimember electoral structure operates to minimize or cancel out their ability to elect their preferred candidates.   See, *e. g.*, S. Rep., at 16.

While many or all of the factors listed in the Senate Report may be relevant to a claim of vote dilution through submergence in multimember districts, unless there is a conjunction of the following circumstances, the use of multimember districts generally will not impede the ability of minority voters to elect representatives of their choice.[15]   Stated succinctly,

---

Black Resources and City Council Representation, 41 J. Pol. 134 (1979); Karnig, Black Representation on City Councils, 12 Urb. Aff. Q. 223 (1976); Parker 87–88.

[14] Not only does "[v]oting along racial lines" deprive minority voters of their preferred representative in these circumstances, it also "allows those elected to ignore [minority] interests without fear of political consequences," *Rogers* v. *Lodge*, 458 U. S., at 623, leaving the minority effectively unrepresented.   See, *e. g.*, Grofman, Should Representatives Be Typical of Their Constituents?, in Representation and Redistricting Issues 97; Parker 108.

[15] Under a "functional" view of the political process mandated by § 2, S. Rep., at 30, n. 120, the most important Senate Report factors bearing on § 2 challenges to multimember districts are the "extent to which minority group members have been elected to public office in the jurisdiction" and the "extent to which voting in the elections of the state or political sub-

a bloc voting majority must *usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group. Bonapfel 355; Blacksher & Menefee 34; Butler 903; Carpeneti 696–699; Davidson, Minority Vote Dilution: An Overview (hereinafter Davidson), in Minority Vote Dilution 4; Grofman, Alternatives 117. Cf. *Bolden*, 446 U. S., at 105, n. 3 (MARSHALL, J., dissenting) ("It is obvious

---

division is racially polarized." *Id.*, 28–29. If present, the other factors, such as the lingering effects of past discrimination, the use of appeals to racial bias in election campaigns, and the use of electoral devices which enhance the dilutive effects of multimember districts when substantial white bloc voting exists—for example antibullet voting laws and majority vote requirements, are supportive of, but *not essential to*, a minority voter's claim.

In recognizing that some Senate Report factors are more important to multimember district vote dilution claims than others, the Court effectuates the intent of Congress. It is obvious that unless minority group members experience substantial difficulty electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability "to elect." § 2(b). And, where the contested electoral structure is a multimember district, commentators and courts agree that in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters. See, *e. g.*, *McMillan* v. *Escambia County, Fla.*, 748 F. 2d 1037, 1043 (CA5 1984); *United States* v. *Marengo County Comm'n*, 731 F. 2d 1546, 1566 (CA11), appeal dism'd and cert. denied, 469 U. S. 976 (1984); *Nevett* v. *Sides*, 571 F. 2d 209, 223 (CA5 1978), cert. denied, 446 U. S. 951 (1980); *Johnson* v. *Halifax County*, 594 F. Supp. 161, 170 (EDNC 1984); Blacksher & Menefee; Engstrom & Wildgen 469; Parker 107. Consequently, if difficulty in electing and white bloc voting are not proved, minority voters have not established that the multimember structure interferes with their ability to elect their preferred candidates. Minority voters may be able to prove that they still suffer social and economic effects of past discrimination, that appeals to racial bias are employed in election campaigns, and that a majority vote is required to win a seat, but they have not demonstrated a substantial inability to elect caused by the use of a multimember district. By recognizing the primacy of the history and extent of minority electoral success and of racial bloc voting, the Court simply requires that § 2 plaintiffs prove their claim before they may be awarded relief.

that the greater the degree to which the electoral minority is homogeneous and insular and the greater the degree that bloc voting occurs along majority-minority lines, the greater will be the extent to which the minority's voting power is diluted by multimember districting"). These circumstances are necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice for the following reasons. First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.[16] If it is not, as would be the case in a substantially integrated district, the *multimember form* of the district cannot be responsible for minority voters' inability to elect its candidates.[17] Cf. *Rogers*, 458

---

[16] In this case appellees allege that within each contested multimember district there exists a minority group that is sufficiently large and compact to constitute a single-member district. In a different kind of case, for example a gerrymander case, plaintiffs might allege that the minority group that is sufficiently large and compact to constitute a single-member district has been split between two or more multimember or single-member districts, with the effect of diluting the potential strength of the minority vote.

[17] The reason that a minority group making such a challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice. The single-member district is generally the appropriate standard against which to measure minority group potential to elect because it is the smallest political unit from which representatives are elected. Thus, if the minority group is spread evenly throughout a multimember district, or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure. As two commentators have explained:

"To demonstrate [that minority voters are injured by at-large elections], the minority voters must be sufficiently concentrated and politically cohe-

U. S., at 616. See also, Blacksher & Menefee 51–56, 58; Bonapfel 355; Carpeneti 696; Davidson 4; Jewell 130. Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. Blacksher & Menefee 51–55, 58–60, and n. 344; Carpeneti 696–697; Davidson 4. Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, see, *infra*, at 57, and n. 26—usually to defeat the minority's preferred candidate. See, *e. g.*, Blacksher & Menefee 51, 53, 56–57, 60. Cf. *Rogers, supra*, at 616–617; *Whitcomb*, 403 U. S., at 158–159; *McMillan* v. *Escambia County, Fla.*, 748 F. 2d 1037, 1043 (CA5 1984). In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives.

Finally, we observe that the usual predictability of the majority's success distinguishes structural dilution from the mere loss of an occasional election. Cf. *Davis* v. *Bandemer, post*, at 131–133, 139–140 (opinion of WHITE, J.); *Bolden, supra*, at 111, n. 7 (MARSHALL, J., dissenting); *Whitcomb, supra*, at 153. See also Blacksher & Menefee 57, n. 333; Note, Geometry and Geography: Racial Gerrymandering and the Voting Rights Act, 94 Yale L. J. 189, 200, n. 66 (1984) (hereinafter Note, Geometry and Geography).

---

sive that a putative districting plan would result in districts in which members of a racial minority would constitute a majority of the voters, whose clear electoral choices are in fact defeated by at-large voting. If minority voters' residences are substantially integrated throughout the jurisdiction, the at-large district cannot be blamed for the defeat of minority-supported candidates . . . . [This standard] thus would only protect racial minority votes from diminution proximately caused by the districting plan; *it would not assure racial minorities proportional representation.*" Blacksher & Menefee 55–56 (footnotes omitted; emphasis added).

## III
## RACIALLY POLARIZED VOTING

Having stated the general legal principles relevant to claims that §2 has been violated through the use of multimember districts, we turn to the arguments of appellants and of the United States as *amicus curiae* addressing racially polarized voting.[18]   First, we describe the District Court's treatment of racially polarized voting.   Next, we consider appellants' claim that the District Court used an incorrect legal standard to determine whether racial bloc voting in the contested districts was sufficiently severe to be cognizable as an element of a §2 claim.   Finally, we consider appellants' contention that the trial court employed an incorrect definition of racially polarized voting and thus erroneously relied on statistical evidence that was not probative of racial bloc voting.

## A
## THE DISTRICT COURT'S TREATMENT OF RACIALLY POLARIZED VOTING

The investigation conducted by the District Court into the question of racial bloc voting credited some testimony of lay witnesses, but relied principally on statistical evidence presented by appellees' expert witnesses, in particular that offered by Dr. Bernard Grofman.   Dr. Grofman collected and evaluated data from 53 General Assembly primary and general elections involving black candidacies.   These elections were held over a period of three different election years in the six originally challenged multimember districts.[19] Dr. Grofman subjected the data to two complementary methods of analysis—extreme case analysis and bivariate eco-

---

[18] The terms "racially polarized voting" and "racial bloc voting" are used interchangeably throughout this opinion.

[19] The 1982 reapportionment plan left essentially undisturbed the 1971 plan for five of the original six contested multimember districts.   House District 39 alone was slightly modified.   Brief for Appellees 8.

logical regression analysis[20]—in order to determine whether blacks and whites in these districts differed in their voting behavior. These analytic techniques yielded data concerning the voting patterns of the two races, including estimates of the percentages of members of each race who voted for black candidates.

The court's initial consideration of these data took the form of a three-part inquiry: did the data reveal any correlation between the race of the voter and the selection of certain candidates; was the revealed correlation statistically significant; and was the difference in black and white voting patterns "substantively significant"? The District Court found that blacks and whites generally preferred different candidates and, on that basis, found voting in the districts to be racially correlated.[21] The court accepted Dr. Grofman's expert opinion that the correlation between the race of the voter and the voter's choice of certain candidates was statistically significant.[22] Finally, adopting Dr. Grofman's terminology, see

---

[20] The District Court found both methods standard in the literature for the analysis of racially polarized voting. 590 F. Supp., at 367, n. 28, 368, n. 32. See also Engstrom & McDonald, Quantitative Evidence in Vote Dilution Litigation: Political Participation and Polarized Voting, 17 Urb. Law. 369 (Summer 1985); Grofman, Migalski, & Noviello, The "Totality of Circumstances Test" in Section 2 of the 1982 Extension of the Voting Rights Act: A Social Science Perspective, 7 Law & Policy 199 (Apr. 1985) (hereinafter Grofman, Migalski, & Noviello).

[21] The court used the term "racial polarization" to describe this correlation. It adopted Dr. Grofman's definition—"racial polarization" exists where there is "a consistent relationship between [the] race of the voter and the way in which the voter votes," Tr. 160, or to put it differently, where "black voters and white voters vote differently." Id., at 203. We, too, adopt this definition of "racial bloc" or "racially polarized" voting. See infra, at 55–58.

[22] The court found that the data reflected positive relationships and that the correlations did not happen by chance. 590 F. Supp., at 368, and n. 30. See also D. Barnes & J. Conley, Statistical Evidence in Litigation 32–34 (1986); Fisher, Multiple Regression in Legal Proceedings, 80 Colum. L. Rev. 702, 716–720 (1980); Grofman, Migalski, & Noviello 206.

Tr. 195, the court found that in all but 2 of the 53 elections[23] the degree of racial bloc voting was "so marked as to be substantively significant, in the sense that the results of the individual election would have been different depending upon whether it had been held among only the white voters or only the black voters." 590 F. Supp., at 368.

The court also reported its findings, both in tabulated numerical form and in written form, that a high percentage of black voters regularly supported black candidates and that most white voters were extremely reluctant to vote for black candidates. The court then considered the relevance to the existence of legally significant white bloc voting of the fact that black candidates have won some elections. It determined that in most instances, special circumstances, such as incumbency and lack of opposition, rather than a diminution in usually severe white bloc voting, accounted for these candidates' success. The court also suggested that black voters' reliance on bullet voting was a significant factor in their successful efforts to elect candidates of their choice. Based on all of the evidence before it, the trial court concluded that each of the districts experienced racially polarized voting "in a persistent and severe degree." *Id.*, at 367.

## B

## THE DEGREE OF BLOC VOTING THAT IS LEGALLY SIGNIFICANT UNDER § 2

### 1

#### *Appellants' Arguments*

North Carolina and the United States argue that the test used by the District Court to determine whether voting patterns in the disputed districts are racially polarized to an extent cognizable under § 2 will lead to results that are inconsistent with congressional intent. North Carolina main-

---

[23] The two exceptions were the 1982 State House elections in Districts 21 and 23. 590 F. Supp., at 368, n. 31.

tains that the court considered legally significant racially polarized voting to occur whenever "less than 50% of the white voters cast a ballot for the black candidate." Brief for Appellants 36. Appellants also argue that racially polarized voting is legally significant only when it always results in the defeat of black candidates. *Id.*, at 39–40.

The United States, on the other hand, isolates a single line in the court's opinion and identifies it as the court's complete test. According to the United States, the District Court adopted a standard under which legally significant racial bloc voting is deemed to exist whenever " 'the results of the individual election would have been different depending upon whether it had been held among only the white voters or only the black voters in the election.' " Brief for United States as *Amicus Curiae* 29 (quoting 590 F. Supp., at 368). We read the District Court opinion differently.

### 2

#### *The Standard for Legally Significant Racial Bloc Voting*

The Senate Report states that the "extent to which voting in the elections of the state or political subdivision is racially polarized," S. Rep., at 29, is relevant to a vote dilution claim. Further, courts and commentators agree that racial bloc voting is a key element of a vote dilution claim. See, *e. g.*, *Escambia County, Fla.*, 748 F. 2d, at 1043; *United States* v. *Marengo County Comm'n*, 731 F. 2d 1546, 1566 (CA11), appeal dism'd and cert. denied, 469 U. S. 976 (1984); *Nevett* v. *Sides*, 571 F. 2d 209, 223 (CA5 1978), cert. denied, 446 U. S. 951 (1980); *Johnson* v. *Halifax County*, 594 F. Supp. 161, 170 (EDNC 1984); Blacksher & Menefee; Engstrom & Wildgen, 465, 469; Parker 107; Note, Geometry and Geography 199. Because, as we explain below, the extent of bloc voting necessary to demonstrate that a minority's ability to elect its preferred representatives is impaired varies according to several factual circumstances, the degree of bloc voting which constitutes the threshold of legal significance will vary

from district to district. Nonetheless, it is possible to state some general principles and we proceed to do so.

The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates. See *supra*, at 48–51. Thus, the question whether a given district experiences legally significant racially polarized voting requires discrete inquiries into minority and white voting practices. A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, Blacksher & Menefee 59–60, and n. 344, and, consequently, establishes minority bloc voting within the context of § 2. And, in general, a white bloc vote that normally will defeat the combined strength of minority support plus white "crossover" votes rises to the level of legally significant white bloc voting. *Id.*, at 60. The amount of white bloc voting that can generally "minimize or cancel," S. Rep., at 28; *Regester*, 412 U. S., at 765, black voters' ability to elect representatives of their choice, however, will vary from district to district according to a number of factors, including the nature of the allegedly dilutive electoral mechanism; the presence or absence of other potentially dilutive electoral devices, such as majority vote requirements, designated posts, and prohibitions against bullet voting; the percentage of registered voters in the district who are members of the minority group; the size of the district; and, in multimember districts, the number of seats open and the number of candidates in the field.[24] See, *e. g.*, Butler 874–876; Davidson 5; Jones, The Impact of Local Election Systems on Black Political Representation, 11 Urb. Aff. Q. 345 (1976); United States Commis-

---

[24] This list of factors is illustrative, not comprehensive.

sion on Civil Rights, The Voting Rights Act: Unfulfilled Goals 38–41 (1981).

Because loss of political power through vote dilution is distinct from the mere inability to win a particular election, *Whitcomb*, 403 U. S., at 153, a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election.[25] Blacksher & Menefee 61; Note, Geometry and Geography 200, n. 66 ("Racial polarization should be seen as an attribute not of a single election, but rather of a polity viewed over time. The concern is necessarily temporal and the analysis historical because the evil to be avoided is the subordination of minority groups in American politics, not the defeat of individuals in particular electoral contests"). Also for this reason, in a district where elections are shown usually to be polarized, the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting. Furthermore, the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances, such as the absence of an opponent, incumbency, or the utilization of bullet voting, may explain minority electoral success in a polarized contest.[26]

As must be apparent, the degree of racial bloc voting that is cognizable as an element of a § 2 vote dilution claim will

---

[25] The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances. One important circumstance is the number of elections in which the minority group has sponsored candidates. Where a minority group has never been able to sponsor a candidate, courts must rely on other factors that tend to prove unequal access to the electoral process. Similarly, where a minority group has begun to sponsor candidates just recently, the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim.

[26] This list of special circumstances is illustrative, not exclusive.

vary according to a variety of factual circumstances. Consequently, there is no simple doctrinal test for the existence of legally significant racial bloc voting. However, the foregoing general principles should provide courts with substantial guidance in determining whether evidence that black and white voters generally prefer different candidates rises to the level of legal significance under § 2.

### 3

### *Standard Utilized by the District Court*

The District Court clearly did not employ the simplistic standard identified by North Carolina—legally significant bloc voting occurs whenever less than 50% of the white voters cast a ballot for the black candidate. Brief for Appellants 36. And, although the District Court did utilize the measure of "substantive significance" that the United States ascribes to it—"'the results of the individual election would have been different depending on whether it had been held among only the white voters or only the black voters,'" Brief for United States as *Amicus Curiae* 29 (quoting 590 F. Supp., at 368)—the court did not reach its ultimate conclusion that the degree of racial bloc voting present in each district is *legally* significant through mechanical reliance on this standard.[27] While the court did not phrase the standard for legally significant racial bloc voting exactly as we do, a fair reading of the court's opinion reveals that the court's analysis conforms to our view of the proper legal standard.

The District Court's findings concerning black support for black candidates in the five multimember districts at issue

---

[27] The trial court did not actually employ the term "legally significant." At times it seems to have used "substantive significance" as Dr. Grofman did, to describe polarization severe enough to result in the selection of different candidates in racially separate electorates. At other times, however, the court used the term "substantively significant" to refer to its ultimate determination that racially polarized voting in these districts is sufficiently severe to be relevant to a § 2 claim.

here clearly establish the political cohesiveness of black voters. As is apparent from the District Court's tabulated findings, reproduced in Appendix A to opinion, *post*, p. 80, black voters' support for black candidates was overwhelming in almost every election. In all but 5 of 16 primary elections, black support for black candidates ranged between 71% and 92%; and in the general elections, black support for black Democratic candidates ranged between 87% and 96%.

In sharp contrast to its findings of strong black support for black candidates, the District Court found that a substantial majority of white voters would rarely, if ever, vote for a black candidate. In the primary elections, white support for black candidates ranged between 8% and 50%, and in the general elections it ranged between 28% and 49%. See *ibid.* The court also determined that, on average, 81.7% of white voters did not vote for any black candidate in the primary elections. In the general elections, white voters almost always ranked black candidates either last or next to last in the multicandidate field, except in heavily Democratic areas where white voters consistently ranked black candidates last among the Democrats, if not last or next to last among all candidates. The court further observed that approximately two-thirds of white voters did not vote for black candidates in general elections, even after the candidate had won the Democratic primary and the choice was to vote for a Republican or for no one.[28]

---

[28] In stating that 81.7% of white voters did not vote for any black candidates in the primary election and that two-thirds of white voters did not vote for black candidates in general elections, the District Court aggregated data from all six challenged multimember districts, apparently for ease of reporting. The inquiry into the existence of vote dilution caused by submergence in a multimember district is district specific. When considering several separate vote dilution claims in a single case, courts must not *rely* on data aggregated from all the challenged districts in concluding that racially polarized voting exists in each district. In the instant case, however, it is clear from the trial court's tabulated findings and from the exhibits that were before it, 1 App., Exs. 2–10, that the court relied on

While the District Court did not state expressly that the percentage of whites who refused to vote for black candidates in the contested districts would, in the usual course of events, result in the defeat of the minority's candidates, that conclusion is apparent both from the court's factual findings and from the rest of its analysis. First, with the exception of House District 23, see *infra*, at 77, the trial court's findings clearly show that black voters have enjoyed only minimal and sporadic success in electing representatives of their choice. See Appendix B to opinion, *post*, p. 82. Second, where black candidates won elections, the court closely examined the circumstances of those elections before concluding that the success of these blacks did not negate other evidence, derived from all of the elections studied in each district, that legally significant racially polarized voting exists in each district. For example, the court took account of the benefits incumbency and running essentially unopposed conferred on some of the successful black candidates,[29] as well as of the

---

data that were specific to each individual district in concluding that each district experienced legally significant racially polarized voting.

[29] For example, the court found that incumbency aided a successful black candidate in the 1978 primary in Senate District 22. The court also noted that in House District 23, a black candidate who gained election in 1978, 1980, and 1982, ran uncontested in the 1978 general election and in both the primary and general elections in 1980. In 1982 there was no Republican opposition, a fact the trial court interpreted to mean that the general election was for all practical purposes unopposed. Moreover, in the 1982 primary, there were only two white candidates for three seats, so that one black candidate had to succeed. Even under this condition, the court remarked, 63% of white voters still refused to vote for the black incumbent — who was the choice of 90% of the blacks. In House District 21, where a black won election to the six-member delegation in 1980 and 1982, the court found that in the relevant primaries approximately 60% to 70% of white voters did *not* vote for the black candidate, whereas approximately 80% of blacks did. The court additionally observed that although winning the Democratic primary in this district is historically tantamount to election, 55% of whites declined to vote for the Democratic black candidate in the general election.

very different order of preference blacks and whites assigned black candidates,[30] in reaching its conclusion that legally significant racial polarization exists in each district.

We conclude that the District Court's approach, which tested data derived from three election years in each district, and which revealed that blacks strongly supported black candidates, while, to the black candidates' usual detriment, whites rarely did, satisfactorily addresses each facet of the proper legal standard.

## C

## EVIDENCE OF RACIALLY POLARIZED VOTING

### 1

### *Appellants' Argument*

North Carolina and the United States also contest the evidence upon which the District Court relied in finding that voting patterns in the challenged districts were racially polarized. They argue that the term "racially polarized voting" must, as a matter of law, refer to voting patterns for which the *principal cause* is race. They contend that the District Court utilized a legally incorrect definition of racially polarized voting by relying on bivariate statistical analyses which merely demonstrated a *correlation* between the race of the voter and the level of voter support for certain candidates, but which did not prove that race was the primary determinant of voters' choices. According to appellants and the United States, only multiple regression analysis, which can take account of other variables which might also explain voters' choices, such as "party affiliation, age, religion, income[,] incumbency, education, campaign expenditures," Brief for

---

[30] The court noted that in the 1982 primary held in House District 36, out of a field of eight, the successful black candidate was ranked first by black voters, but seventh by whites. Similarly, the court found that the two blacks who won seats in the five-member delegation from House District 39 were ranked first and second by black voters, but seventh and eighth by white voters.

Appellants 42, "media use measured by cost, . . . name, identification, or distance that a candidate lived from a particular precinct," Brief for United States as *Amicus Curiae* 30, n. 57, can prove that race was the primary determinant of voter behavior.[31]

Whether appellants and the United States believe that it is the voter's race or the candidate's race that must be the primary determinant of the voter's choice is unclear; indeed, their catalogs of relevant variables suggest both.[32] Age, religion, income, and education seem most relevant to the voter; incumbency, campaign expenditures, name identification, and media use are pertinent to the candidate; and party affiliation could refer both to the voter and the candidate. In either case, we disagree: For purposes of §2, the legal concept of racially polarized voting incorporates neither causation nor intent. It means simply that the race of voters correlates with the selection of a certain candidate or candidates; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates. Grofman, Migalski, & Noviello 203. As we demonstrate *infra*, appellants' theory of racially polarized voting would thwart the goals Congress sought to achieve when it amended §2 and would prevent courts from performing the "functional" analysis of the political process, S. Rep., at 30, n. 119, and the "searching practical evaluation of the 'past

---

[31] Appellants argue that plaintiffs must establish that race was the primary determinant of voter behavior as part of their prima facie showing of polarized voting; the United States suggests that plaintiffs make out a prima facie case merely by showing a correlation between race and the selection of certain candidates, but that defendants should be able to rebut by showing that factors other than race were the principal causes of voters' choices. We reject both arguments.

[32] The Fifth Circuit cases on which North Carolina and the United States rely for their position are equally ambiguous. See *Lee County Branch of NAACP v. Opelika*, 748 F. 2d 1473, 1482 (1984); *Jones v. Lubbock*, 730 F. 2d 233, 234 (1984) (Higginbotham, J., concurring).

and present reality,'" *id.*, at 30 (footnote omitted), mandated by the Senate Report.

2

*Causation Irrelevant to Section 2 Inquiry*

The first reason we reject appellants' argument that racially polarized voting refers to voting patterns that are in some way *caused by race*, rather than to voting patterns that are merely *correlated with the race of the voter*, is that the reasons black and white voters vote differently have no relevance to the central inquiry of § 2. By contrast, the correlation between race of voter and the selection of certain candidates is crucial to that inquiry.

Both § 2 itself and the Senate Report make clear that the critical question in a § 2 claim is whether the use of a contested electoral practice or structure results in members of a protected group having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. See, *e. g.*, S. Rep., at 2, 27, 28, 29, n. 118, 36. As we explained, *supra*, at 47–48, multimember districts may impair the ability of blacks to elect representatives of their choice where blacks vote sufficiently as a bloc as to be able to elect their preferred candidates in a black majority, single-member district and where a white majority votes sufficiently as a bloc usually to defeat the candidates chosen by blacks. It is the *difference* between the choices made by blacks and whites—not the reasons for that difference—that results in blacks having less opportunity than whites to elect their preferred representatives. Consequently, we conclude that under the "results test" of § 2, only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters.

The irrelevance to a § 2 inquiry of the reasons why black and white voters vote differently supports, by itself, our rejection of appellants' theory of racially polarized voting. However, their theory contains other equally serious flaws

that merit further attention.   As we demonstrate below, the addition of irrelevant variables distorts the equation and yields results that are indisputably incorrect under § 2 and the Senate Report.

3

*Race of Voter as Primary Determinant of Voter Behavior*

Appellants and the United States contend that the legal concept of "racially polarized voting" refers not to voting patterns that are merely *correlated with the voter's race,* but to voting patterns that are *determined primarily by the voter's race,* rather than by the voter's other socioeconomic characteristics.

The first problem with this argument is that it ignores the fact that members of geographically insular racial and ethnic groups frequently share socioeconomic characteristics, such as income level, employment status, amount of education, housing and other living conditions, religion, language, and so forth.   See, *e. g.,* Butler 902 (Minority group "members' shared concerns, including political ones, are . . . a function of group status, and as such are largely involuntary. . . . As a group blacks are concerned, for example, with police brutality, substandard housing, unemployment, etc., because these problems fall disproportionately upon the group"); S. Verba & N. Nie, Participation in America 151–152 (1972) ("Socioeconomic status . . . is closely related to race.   Blacks in American society are likely to be in lower-status jobs than whites, to have less education, and to have lower incomes").   Where such characteristics are shared, race or ethnic group not only denotes color or place of origin, it also functions as a shorthand notation for common social and economic characteristics.   Appellants' definition of racially polarized voting is even more pernicious where shared characteristics are causally related to race or ethnicity.   The opportunity to achieve high employment status and income, for example, is often influenced by the presence or absence of racial or ethnic discrimination.   A definition of racially polarized voting which

holds that black bloc voting does not exist when black voters' choice of certain candidates is most strongly influenced by the fact that the voters have low incomes and menial jobs — when the reason most of those voters have menial jobs and low incomes is attributable to past or present racial discrimination — runs counter to the Senate Report's instruction to conduct a searching and practical evaluation of past and present reality, S. Rep., at 30, and interferes with the purpose of the Voting Rights Act to eliminate the negative effects of past discrimination on the electoral opportunities of minorities. *Id.*, at 5, 40.

Furthermore, under appellants' theory of racially polarized voting, even uncontrovertible evidence that candidates strongly preferred by black voters are *always* defeated by a bloc voting white majority would be dismissed for failure to prove racial polarization whenever the black and white populations could be described in terms of other socioeconomic characteristics.

To illustrate, assume a racially mixed, urban multimember district in which blacks and whites possess the same socioeconomic characteristics that the record in this case attributes to blacks and whites in Halifax County, a part of Senate District 2. The annual mean income for blacks in this district is $10,465, and 47.8% of the black community lives in poverty. More than half—51.5%—of black adults over the age of 25 have only an eighth-grade education or less. Just over half of black citizens reside in their own homes; 48.9% live in rental units. And, almost a third of all black households are without a car. In contrast, only 12.6% of the whites in the district live below the poverty line. Whites enjoy a mean income of $19,042. White residents are better educated than blacks — only 25.6% of whites over the age of 25 have only an eighth-grade education or less. Furthermore, only 26.2% of whites live in rental units, and only 10.2% live in households with no vehicle available. 1 App., Ex–44. As is the case in Senate District 2, blacks in this

hypothetical urban district have never been able to elect a representative of their choice.

According to appellants' theory of racially polarized voting, proof that black and white voters in this hypothetical district regularly choose different candidates and that the blacks' preferred candidates regularly lose could be rejected as not probative of racial bloc voting. The basis for the rejection would be that blacks chose a certain candidate, not principally because of their race, but principally because this candidate best represented the interests of residents who, because of their low incomes, are particularly interested in government-subsidized health and welfare services; who are generally poorly educated, and thus share an interest in job training programs; who are, to a greater extent than the white community, concerned with rent control issues; and who favor major public transportation expenditures. Similarly, whites would be found to have voted for a different candidate, not principally because of their race, but primarily because that candidate best represented the interests of residents who, due to their education and income levels, and to their property and vehicle ownership, favor gentrification, low residential property taxes, and extensive expenditures for street and highway improvements.

Congress could not have intended that courts employ this definition of racial bloc voting. First, this definition leads to results that are inconsistent with the effects test adopted by Congress when it amended § 2 and with the Senate Report's admonition that courts take a "functional" view of the political process, S. Rep. 30, n. 119, and conduct a searching and practical evaluation of reality. *Id.*, at 30. A test for racially polarized voting that denies the fact that race and socioeconomic characteristics are often closely correlated permits neither a practical evaluation of reality nor a functional analysis of vote dilution. And, contrary to Congress' intent in adopting the "results test," appellants' proposed definition could result in the inability of minority voters to establish a critical

element of a vote dilution claim, even though both races engage in "monolithic" bloc voting, *id.*, at 33, and generations of black voters have been unable to elect a representative of their choice.

Second, appellants' interpretation of "racially polarized voting" creates an irreconcilable tension between their proposed treatment of socioeconomic characteristics in the bloc voting context and the Senate Report's statement that "the extent to which members of the minority group . . . bear the effects of discrimination in such areas as education, employment and health" may be relevant to a § 2 claim. *Id.*, at 29. We can find no support in either logic or the legislative history for the anomalous conclusion to which appellants' position leads—that Congress intended, on the one hand, that proof that a minority group is predominately poor, uneducated, and unhealthy should be considered a factor tending to prove a § 2 violation; but that Congress intended, on the other hand, that proof that the same socioeconomic characteristics greatly influence black voters' choice of candidates should destroy these voters' ability to establish one of the most important elements of a vote dilution claim.

### 4

### *Race of Candidate as Primary Determinant of Voter Behavior*

North Carolina's and the United States' suggestion that racially polarized voting means that voters select or reject candidates *principally* on the basis of the *candidate's race* is also misplaced.

First, both the language of § 2 and a functional understanding of the phenomenon of vote dilution mandate the conclusion that the race of the candidate *per se* is irrelevant to racial bloc voting analysis. Section 2(b) states that a violation is established if it can be shown that members of a protected minority group "have less opportunity than other members of the electorate to . . . elect representatives *of their choice.*"

(Emphasis added.) Because both minority and majority voters often select members of their own race as their preferred representatives, it will frequently be the case that a black candidate is the choice of blacks, while a white candidate is the choice of whites. Cf. Letter to the Editor from Chandler Davidson, 17 New Perspectives 38 (Fall 1985). Indeed, the facts of this case illustrate that tendency—blacks preferred black candidates, whites preferred white candidates. Thus, as a matter of convenience, we and the District Court may refer to the preferred representative of black voters as the "black candidate" and to the preferred representative of white voters as the "white candidate." Nonetheless, the fact that race of voter and race of candidate is often correlated is not directly pertinent to a §2 inquiry. Under §2, it is the *status* of the candidate as the *chosen representative of a particular racial group*, not the race of the candidate, that is important.

An understanding of how vote dilution through submergence in a white majority works leads to the same conclusion. The essence of a submergence claim is that minority group members prefer certain candidates whom they could elect were it not for the interaction of the challenged electoral law or structure with a white majority that votes as a significant bloc for different candidates. Thus, as we explained in Part III, *supra*, the existence of racial bloc voting is relevant to a vote dilution claim in two ways. Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district. Bloc voting by a white majority tends to prove that blacks will generally be unable to elect representatives of their choice. Clearly, only the race of the voter, not the race of the candidate, is relevant to vote dilution analysis. See, *e. g.*, Blacksher & Menefee 59–60; Grofman, Should Representatives be Typical?, in Representation and Redistricting Issues 98; Note, Geometry and Geography 207.

Second, appellants' suggestion that racially polarized voting refers to voting patterns where whites vote for white candidates because they prefer members of their own race or are hostile to blacks, as opposed to voting patterns where whites vote for white candidates because the white candidates spent more on their campaigns, utilized more media coverage, and thus enjoyed greater name recognition than the black candidates, fails for another, independent reason. This argument, like the argument that the race of the voter must be the primary determinant of the voter's ballot, is inconsistent with the purposes of §2 and would render meaningless the Senate Report factor that addresses the impact of low socioeconomic status on a minority group's level of political participation.

Congress intended that the Voting Rights Act eradicate inequalities in political opportunities that exist due to the vestigial effects of past purposeful discrimination. S. Rep., at 5, 40; H. R. Rep. No. 97–227, p. 31 (1981). Both this Court and other federal courts have recognized that political participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes. See, *e. g.*, *White* v. *Regester*, 412 U. S., at 768–769; *Kirksey* v. *Board of Supervisors of Hinds County, Miss.*, 554 F. 2d 139, 145–146 (CA5) (en banc), cert. denied, 434 U. S. 968 (1977). See also S. Verba & N. Nie, Participation in America 152 (1972). The Senate Report acknowledges this tendency and instructs that "the extent to which members of the minority group . . . bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process," S. Rep., at 29 (footnote omitted), is a factor which may be probative of unequal opportunity to participate in the political process and to elect representatives. Courts and commentators have recognized further that candidates generally must spend more money in order to win

election in a multimember district than in a single-member district. See, *e. g., Graves* v. *Barnes*, 343 F. Supp. 704, 720–721 (WD Tex. 1972), aff'd in part and rev'd in part *sub nom. White* v. *Regester, supra.* Berry & Dye 88; Davidson & Fraga, Nonpartisan Slating Groups in an At-Large Setting, in Minority Vote Dilution 122–123; Derfner 554, n. 126; Jewell 131; Karnig, Black Representation on City Councils, 12 Urb. Aff. Q. 223, 230 (1976). If, because of inferior education and poor employment opportunities, blacks earn less than whites, they will not be able to provide the candidates of their choice with the same level of financial support that whites can provide theirs. Thus, electoral losses by candidates preferred by the black community may well be attributable in part to the fact that their white opponents outspent them. But, the fact is that, in this instance, the economic effects of prior discrimination have combined with the multimember electoral structure to afford blacks less opportunity than whites to participate in the political process and to elect representatives of their choice. It would be both anomalous and inconsistent with congressional intent to hold that, on the one hand, the effects of past discrimination which hinder blacks' ability to participate in the political process tend to prove a § 2 violation, while holding on the other hand that, where these same effects of past discrimination deter whites from voting for blacks, blacks cannot make out a crucial element of a vote dilution claim. Accord, *Escambia County*, 748 F. 2d, at 1043 ("'[T]he failure of the blacks to solicit white votes may be caused by the effects of past discrimination'") (quoting *United States* v. *Dallas County Comm'n*, 739 F. 2d 1529, 1536 (CA11 1984)); *United States* v. *Marengo County Comm'n*, 731 F. 2d, at 1567.

5

### *Racial Animosity as Primary Determinant of Voter Behavior*

Finally, we reject the suggestion that racially polarized voting refers only to white bloc voting which is caused by

white voters' *racial hostility* toward black candidates.[33]   To accept this theory would frustrate the goals Congress sought to achieve by repudiating the intent test of *Mobile* v. *Bolden*, 446 U. S. 55 (1980), and would prevent minority voters who have clearly been denied an opportunity to elect representatives of their choice from establishing a critical element of a vote dilution claim.

In amending § 2, Congress rejected the requirement announced by this Court in *Bolden*, *supra*, that § 2 plaintiffs must prove the discriminatory intent of state or local governments in adopting or maintaining the challenged electoral mechanism.[34]   Appellants' suggestion that the discriminatory intent of individual white voters must be proved in order to make out a § 2 claim must fail for the very reasons Congress rejected the intent test with respect to governmental bodies. See Engstrom, The Reincarnation of the Intent Standard: Federal Judges and At-Large Election Cases, 28 How. L. J. 495 (1985).

The Senate Report states that one reason the Senate Committee abandoned the intent test was that "the Committee . . . heard persuasive testimony that the intent test is unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities."   S. Rep., at 36.   The Committee found the testimony of Dr. Arthur S.

---

[33] It is true, as we have recognized previously, that racial hostility may often fuel racial bloc voting.   *United Jewish Organizations* v. *Carey*, 430 U. S. 144, 166 (1977); *Rogers* v. *Lodge*, 458 U. S., at 623.   But, as we explain in this decision, the actual motivation of the voter has no relevance to a vote dilution claim.   This is not to suggest that racial bloc voting is race neutral; because voter behavior correlates with race, obviously it is not.   It should be remembered, though, as one commentator has observed, that "[t]he absence of racial animus is but one element of race neutrality."   Note, Geometry and Geography 208.

[34] The Senate Report rejected the argument that the words "on account of race," contained in § 2(a), create any requirement of purposeful discrimination.   "[I]t is patently [clear] that Congress has used the words 'on account of race or color' in the Act to mean 'with respect to' race or color, and not to connote any required purpose of racial discrimination." S. Rep., at 27–28, n. 109.

Flemming, Chairman of the United States Commission on Civil Rights, particularly persuasive. He testified:

> "'[Under an intent test] [l]itigators representing excluded minorities will have to explore the motivations of individual council members, mayors, and other citizens. The question would be whether their decisions were motivated by invidious racial considerations. Such inquiries can only be divisive, threatening to destroy any existing racial progress in a community. It is the intent test, not the results test, that would make it necessary to brand individuals as racist in order to obtain judicial relief.'" *Ibid.* (footnote omitted).

The grave threat to racial progress and harmony which Congress perceived from requiring proof that racism caused the adoption or maintenance of a challenged electoral mechanism is present to a much greater degree in the proposed requirement that plaintiffs demonstrate that racial animosity determined white voting patterns. Under the old intent test, plaintiffs might succeed by proving only that a limited number of elected officials were racist; under the new intent test plaintiffs would be required to prove that most of the white community is racist in order to obtain judicial relief. It is difficult to imagine a more racially divisive requirement.

A second reason Congress rejected the old intent test was that in most cases it placed an "inordinately difficult burden" on § 2 plaintiffs. *Ibid.* The new intent test would be equally, if not more, burdensome. In order to prove that a *specific factor*—racial hostility—*determined* white voters' ballots, it would be necessary to demonstrate that other potentially relevant *causal factors*, such as socioeconomic characteristics and candidate expenditures, do not correlate better than racial animosity with white voting behavior. As one commentator has explained:

"Many of the[se] independent variables . . . would be all but impossible for a social scientist to operationalize as interval-level independent variables for use in a multiple regression equation, whether on a step-wise basis or not. To conduct such an extensive statistical analysis as this implies, moreover, can become prohibitively expensive.

"Compared to this sort of effort, proving discriminatory intent in the adoption of an at-large election system is both simple and inexpensive." McCrary, Discriminatory Intent: The Continuing Relevance of "Purpose" Evidence in Vote-Dilution Lawsuits, 28 How. L. J. 463, 492 (1985) (footnote omitted).

The final and most dispositive reason the Senate Report repudiated the old intent test was that it "asks the wrong question." S. Rep., at 36. Amended § 2 asks instead "whether minorities have equal access to the process of electing their representatives." *Ibid.*

Focusing on the discriminatory intent of the voters, rather than the behavior of the voters, also asks the wrong question. All that matters under § 2 and under a functional theory of vote dilution is voter behavior, not its explanations. Moreover, as we have explained in detail, *supra*, requiring proof that racial considerations actually *caused* voter behavior will result — contrary to congressional intent — in situations where a black minority that functionally has been totally excluded from the political process will be unable to establish a § 2 violation. The Senate Report's remark concerning the old intent test thus is pertinent to the new test: The requirement that a "court . . . make a separate . . . finding of intent, after accepting the proof of the factors involved in the *White* [v. *Regester*, 412 U. S. 755] analysis . . . [would] seriously clou[d] the prospects of eradicating the remaining instances of racial discrimination in American elections." *Id.*, at 37. We therefore decline to adopt such a requirement.

## 6
### *Summary*

In sum, we would hold that the legal concept of racially polarized voting, as it relates to claims of vote dilution, refers only to the existence of a correlation between the race of voters and the selection of certain candidates. Plaintiffs need not prove causation or intent in order to prove a prima facie case of racial bloc voting and defendants may not rebut that case with evidence of causation or intent.

## IV
## THE LEGAL SIGNIFICANCE OF SOME BLACK CANDIDATES' SUCCESS

### A

North Carolina and the United States maintain that the District Court failed to accord the proper weight to the success of some black candidates in the challenged districts. Black residents of these districts, they point out, achieved improved representation in the 1982 General Assembly election.[35] They also note that blacks in House District 23 have enjoyed proportional representation consistently since 1973 and that blacks in the other districts have occasionally enjoyed nearly proportional representation.[36] This electoral

---

[35] The relevant results of the 1982 General Assembly election are as follows. House District 21, in which blacks make up 21.8% of the population, elected one black to the six-person House delegation. House District 23, in which blacks constitute 36.3% of the population, elected one black to the three-person House delegation. In House District 36, where blacks constitute 26.5% of the population, one black was elected to the eight-member delegation. In House District 39, where 25.1% of the population is black, two blacks were elected to the five-member delegation. In Senate District 22, where blacks constitute 24.3% of the population, no black was elected to the Senate in 1982.

[36] The United States points out that, under a substantially identical predecessor to the challenged plan, see n. 15, *supra*, House District 21 elected a black to its six-member delegation in 1980, House District 39

success demonstrates conclusively, appellants and the United States argue, that blacks in those districts do not have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U. S. C. § 1973(b). Essentially, appellants and the United States contend that if a racial minority gains proportional or nearly proportional representation in a single election, that fact alone precludes, as a matter of law, finding a § 2 violation.

Section 2(b) provides that "[t]he extent to which members of a protected class have been elected to office . . . is one circumstance which may be considered." 42 U. S. C. § 1973(b). The Senate Committee Report also identifies the extent to which minority candidates have succeeded as a pertinent factor. S. Rep., at 29. However, the Senate Report expressly states that "the election of a few minority candidates does not 'necessarily foreclose the possibility of dilution of the black vote,'" noting that if it did, "the possibility exists that the majority citizens might evade [§ 2] by manipulating the election of a 'safe' minority candidate." *Id.*, at 29, n. 115, quoting *Zimmer* v. *McKeithen*, 485 F. 2d 1297, 1307 (CA5 1973) (en banc), aff'd *sub nom. East Carroll Parish School Board* v. *Marshall*, 424 U. S. 636 (1976) *(per curiam).* The Senate Committee decided, instead, to "'require an independent consideration of the record.'" S. Rep., at 29, n. 115. The Senate Report also emphasizes that the question whether "the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality.'" *Id.*, at 30 (footnote omitted). Thus, the language of § 2 and its legislative history plainly demonstrate that proof that some minority candidates have been elected does not foreclose a § 2 claim.

Moreover, in conducting its "independent consideration of the record" and its "searching practical evaluation of the 'past

___

elected a black to its five-member delegation in 1974 and 1976, and Senate District 22 had a black Senator between 1975 and 1980.

and present reality,'" the District Court could appropriately take account of the circumstances surrounding recent black electoral success in deciding its significance to appellees' claim. In particular, as the Senate Report makes clear, *id.*, at 29, n. 115, the court could properly notice the fact that black electoral success increased markedly in the 1982 election—an election that occurred after the instant lawsuit had been filed—and could properly consider to what extent "the pendency of this very litigation [might have] worked a one-time advantage for black candidates in the form of unusual organized political support by white leaders concerned to forestall single-member districting."[37] 590 F. Supp., at 367, n. 27.

Nothing in the statute or its legislative history prohibited the court from viewing with some caution black candidates' success in the 1982 election, and from deciding on the basis of all the relevant circumstances to accord greater weight to blacks' relative lack of success over the course of several recent elections. Consequently, we hold that the District Court did not err, as a matter of law, in refusing to treat the fact that some black candidates have succeeded as dispositive of appellees' § 2 claim. Where multimember districting generally works to dilute the minority vote, it cannot be defended on the ground that it sporadically and serendipitously benefits minority voters.

---

[37] See also *Zimmer* v. *McKeithen,* 485 F. 2d, at 1307 ("[W]e cannot endorse the view that the success of black candidates at the polls necessarily forecloses the possibility of dilution of the black vote. Such success might, on occasion, be attributable to the work of politicians, who, apprehending that the support of a black candidate would be politically expedient, campaign to insure his election. Or such success might be attributable to political support motivated by different considerations—namely that election of a black candidate will thwart successful challenges to electoral schemes on dilution grounds. In either situation, a candidate could be elected despite the relative political backwardness of black residents in the electoral district").

## B

The District Court did err, however, in ignoring the significance of the *sustained* success black voters have experienced in House District 23. In that district, the last six elections have resulted in proportional representation for black residents. This persistent proportional representation is inconsistent with appellees' allegation that the ability of black voters in District 23 to elect representatives of their choice is not equal to that enjoyed by the white majority.

In some situations, it may be possible for § 2 plaintiffs to demonstrate that such sustained success does not accurately reflect the minority group's ability to elect its preferred representatives,[38] but appellees have not done so here. Appellees presented evidence relating to black electoral success in the last three elections; they failed utterly, though, to offer any explanation for the success of black candidates in the previous three elections. Consequently, we believe that the District Court erred, as a matter of law, in ignoring the sustained success black voters have enjoyed in House District 23, and would reverse with respect to that District.

## V

## ULTIMATE DETERMINATION OF VOTE DILUTION

Finally, appellants and the United States dispute the District Court's ultimate conclusion that the multimember districting scheme at issue in this case deprived black voters of an equal opportunity to participate in the political process and to elect representatives of their choice.

## A

As an initial matter, both North Carolina and the United States contend that the District Court's ultimate conclusion that the challenged multimember districts operate to dilute

---

[38] We have no occasion in this case to decide what types of special circumstances could satisfactorily demonstrate that sustained success does not accurately reflect the minority's ability to elect its preferred representatives.

black citizens' votes is a mixed question of law and fact subject to *de novo* review on appeal. In support of their proposed standard of review, they rely primarily on *Bose Corp.* v. *Consumers Union of U. S., Inc.,* 466 U. S. 485 (1984), a case in which we reconfirmed that, as a matter of constitutional law, there must be independent appellate review of evidence of "actual malice" in defamation cases. Appellants and the United States argue that because a finding of vote dilution under amended § 2 requires the application of a rule of law to a particular set of facts it constitutes a legal, rather than factual, determination. Reply Brief for Appellants 7; Brief for United States as *Amicus Curiae* 18–19. Neither appellants nor the United States cite our several precedents in which we have treated the ultimate finding of vote dilution as a question of fact subject to the clearly-erroneous standard of Rule 52(a). See, *e. g., Rogers* v. *Lodge,* 458 U. S., at 622–627; *City of Rome* v. *United States,* 446 U. S. 156, 183 (1980); *White* v. *Regester,* 412 U. S., at 765–770. Cf. *Anderson* v. *Bessemer City,* 470 U. S. 564, 573 (1985).

In *Regester, supra,* we noted that the District Court had based its conclusion that minority voters in two multimember districts in Texas had less opportunity to participate in the political process than majority voters on the totality of the circumstances and stated that

> "we are not inclined to overturn these findings, representing as they do a blend of history and an intensely local appraisal of the design and impact of the . . . multimember district in the light of past and present reality, political and otherwise." *Id.,* at 769–770.

Quoting this passage from *Regester* with approval, we expressly held in *Rogers* v. *Lodge, supra,* that the question whether an at-large election system was maintained for discriminatory purposes and subsidiary issues, which include whether that system had the effect of diluting the minority vote, were questions of fact, reviewable under Rule 52(a)'s

clearly-erroneous standard. 458 U. S., at 622–623. Similarly, in *City of Rome* v. *United States*, we declared that the question whether certain electoral structures had a "discriminatory effect," in the sense of diluting the minority vote, was a question of fact subject to clearly-erroneous review. 446 U. S., at 183.

We reaffirm our view that the clearly-erroneous test of Rule 52(a) is the appropriate standard for appellate review of a finding of vote dilution. As both amended § 2 and its legislative history make clear, in evaluating a statutory claim of vote dilution through districting, the trial court is to consider the "totality of the circumstances" and to determine, based "upon a searching practical evaluation of the 'past and present reality,'" S. Rep., at 30 (footnote omitted), whether the political process is equally open to minority voters. "'This determination is peculiarly dependent upon the facts of each case,'" *Rogers, supra*, at 621, quoting *Nevett* v. *Sides*, 571 F. 2d 209, 224 (CA5 1978), and requires "an intensely local appraisal of the design and impact" of the contested electoral mechanisms. 458 U. S., at 622. The fact that amended § 2 and its legislative history provide legal standards which a court must apply to the facts in order to determine whether § 2 has been violated does not alter the standard of review. As we explained in *Bose*, Rule 52(a) "does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." 466 U. S., at 501, citing *Pullman-Standard* v. *Swint*, 456 U. S. 273, 287 (1982); *Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc.*, 456 U. S. 844, 855, n. 15 (1982). Thus, the application of the clearly-erroneous standard to ultimate findings of vote dilution preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law.

### B

The District Court in this case carefully considered the totality of the circumstances and found that in each district racially polarized voting; the legacy of official discrimination in voting matters, education, housing, employment, and health services; and the persistence of campaign appeals to racial prejudice acted in concert with the multimember districting scheme to impair the ability of geographically insular and politically cohesive groups of black voters to participate equally in the political process and to elect candidates of their choice. It found that the success a few black candidates have enjoyed in these districts is too recent, too limited, and, with regard to the 1982 elections, perhaps too aberrational, to disprove its conclusion. Excepting House District 23, with respect to which the District Court committed legal error, see *supra*, at 77, we affirm the District Court's judgment. We cannot say that the District Court, composed of local judges who are well acquainted with the political realities of the State, clearly erred in concluding that use of a multimember electoral structure has caused black voters in the districts other than House District 23 to have less opportunity than white voters to elect representatives of their choice.

The judgment of the District Court is

*Affirmed in part and reversed in part.*

### APPENDIX A TO OPINION OF BRENNAN, J.

Percentages of Votes Cast by Black and White Voters for Black Candidates in the Five Contested Districts

*Senate District 22*

|  | Primary | | General | |
|---|---|---|---|---|
|  | *White* | *Black* | *White* | *Black* |
| 1978 (Alexander) | 47 | 87 | 41 | 94 |
| 1980 (Alexander) | 23 | 78 | n/a | n/a |
| 1982 (Polk) | 32 | 83 | 33 | 94 |

### House District 21

| | Primary | | General | |
| --- | --- | --- | --- | --- |
| | White | Black | White | Black |
| 1978 (Blue) | 21 | 76 | n/a | n/a |
| 1980 (Blue) | 31 | 81 | 44 | 90 |
| 1982 (Blue) | 39 | 82 | 45 | 91 |

### House District 23

| | Primary | | General | |
| --- | --- | --- | --- | --- |
| | White | Black | White | Black |
| *1978 Senate* | | | | |
| Barns (Repub.) | n/a | n/a | 17 | 5 |
| *1978 House* | | | | |
| Clement | 10 | 89 | n/a | n/a |
| Spaulding | 16 | 92 | 37 | 89 |
| *1980 House* | | | | |
| Spaulding | n/a | n/a | 49 | 90 |
| *1982 House* | | | | |
| Clement | 26 | 32 | n/a | n/a |
| Spaulding | 37 | 90 | 43 | 89 |

### House District 36

| | Primary | | General | |
| --- | --- | --- | --- | --- |
| | White | Black | White | Black |
| 1980 (Maxwell) | 22 | 71 | 28 | 92 |
| 1982 (Berry) | 50 | 79 | 42 | 92 |
| 1982 (Richardson) | 39 | 71 | 29 | 88 |

### House District 39

| | Primary | | General | |
| --- | --- | --- | --- | --- |
| | White | Black | White | Black |
| *1978 House* | | | | |
| Kennedy, H. | 28 | 76 | 32 | 93 |
| Norman | 8 | 29 | n/a | n/a |
| Ross | 17 | 53 | n/a | n/a |
| Sumter (Repub.) | n/a | n/a | 33 | 25 |

*House District 39*

| | Primary | | General | |
| --- | --- | --- | --- | --- |
| | *White* | *Black* | *White* | *Black* |
| *1980 House* | | | | |
| Kennedy, A. | 40 | 86 | 32 | 96 |
| Norman | 18 | 36 | n/a | n/a |
| *1980 Senate* | | | | |
| Small | 12 | 61 | n/a | n/a |
| *1982 House* | | | | |
| Hauser | 25 | 80 | 42 | 87 |
| Kennedy, A. | 36 | 87 | 46 | 94 |

590 F. Supp., at 369–371.

## APPENDIX B TO OPINION OF BRENNAN, J.

### Black Candidates Elected From 7 Originally Contested Districts

| District (No. Seats) | Prior to 1972 | 1972 | 1974 | 1976 | 1978 | 1980 | 1982 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| House  8 (4) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| House 21 (6) | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| House 23 (3) | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| House 36 (8) | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| House 39 (5) | 0 | 0 | 1 | 1 | 0 | 0 | 2 |
| Senate  2 (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Senate 22 (4) | 0 | 0 | 1 | 1 | 1 | 0 | 0 |

See Brief for Appellees, table printed between pages 8 and 9; App. 93–94.

JUSTICE WHITE, concurring.

I join Parts I, II, III–A, III–B, IV–A, and V of the Court's opinion and agree with JUSTICE BRENNAN's opinion as to Part IV–B.   I disagree with Part III–C of JUSTICE BRENNAN's opinion.

JUSTICE BRENNAN states in Part III–C that the crucial factor in identifying polarized voting is the race of the voter and that the race of the candidate is irrelevant. Under this test, there is polarized voting if the majority of white voters vote for different candidates than the majority of the blacks, regardless of the race of the candidates. I do not agree. Suppose an eight-member multimember district that is 60% white and 40% black, the blacks being geographically located so that two safe black single-member districts could be drawn. Suppose further that there are six white and two black Democrats running against six white and two black Republicans. Under JUSTICE BRENNAN's test, there would be polarized voting and a likely §2 violation if all the Republicans, including the two blacks, are elected, and 80% of the blacks in the predominantly black areas vote Democratic. I take it that there would also be a violation in a single-member district that is 60% black, but enough of the blacks vote with the whites to elect a black candidate who is not the choice of the majority of black voters. This is interest-group politics rather than a rule hedging against racial discrimination. I doubt that this is what Congress had in mind in amending §2 as it did, and it seems quite at odds with the discussion in *Whitcomb* v. *Chavis*, 403 U. S. 124, 149–160 (1971). Furthermore, on the facts of this case, there is no need to draw the voter/candidate distinction. The District Court did not and reached the correct result except, in my view, with respect to District 23.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE POWELL, and JUSTICE REHNQUIST join, concurring in the judgment.

In this case, we are called upon to construe §2 of the Voting Rights Act of 1965, as amended June 29, 1982. Amended §2 is intended to codify the "results" test employed in *Whitcomb* v. *Chavis*, 403 U. S. 124 (1971), and *White* v. *Regester*, 412 U. S. 755 (1973), and to reject the "intent" test propounded in the plurality opinion in *Mobile* v. *Bolden*, 446

U. S. 55 (1980). S. Rep. No. 97–417, pp. 27–28 (1982) (hereinafter S. Rep.). Whereas *Bolden* required members of a racial minority who alleged impairment of their voting strength to prove that the challenged electoral system was created or maintained with a discriminatory purpose and led to discriminatory results, under the results test, "plaintiffs may choose to establish discriminatory results without proving any kind of discriminatory purpose." S. Rep., at 28. At the same time, however, § 2 unequivocally disclaims the creation of a right to proportional representation. This disclaimer was essential to the compromise that resulted in passage of the amendment. See *id.*, at 193–194 (additional views of Sen. Dole).

In construing this compromise legislation, we must make every effort to be faithful to the balance Congress struck. This is not an easy task. We know that Congress intended to allow vote dilution claims to be brought under § 2, but we also know that Congress did not intend to create a right to proportional representation for minority voters. There is an inherent tension between what Congress wished to do and what it wished to avoid, because any theory of vote dilution must necessarily rely to some extent on a measure of minority voting strength that makes some reference to the proportion between the minority group and the electorate at large. In addition, several important aspects of the "results" test had received little attention in this Court's cases or in the decisions of the Courts of Appeals employing that test on which Congress also relied. See *id.*, at 32. Specifically, the legal meaning to be given to the concepts of "racial bloc voting" and "minority voting strength" had been left largely unaddressed by the courts when § 2 was amended.

The Court attempts to resolve all these difficulties today. First, the Court supplies definitions of racial bloc voting and minority voting strength that will apparently be applicable in all cases and that will dictate the structure of vote dilution litigation. Second, the Court adopts a test, based on the

level of minority electoral success, for determining when an electoral scheme has sufficiently diminished minority voting strength to constitute vote dilution. Third, although the Court does not acknowledge it expressly, the combination of the Court's definition of minority voting strength and its test for vote dilution results in the creation of a right to a form of proportional representation in favor of all geographically and politically cohesive minority groups that are large enough to constitute majorities if concentrated within one or more single-member districts. In so doing, the Court has disregarded the balance struck by Congress in amending § 2 and has failed to apply the results test as described by this Court in *Whitcomb* and *White*.

## I

In order to explain my disagreement with the Court's interpretation of § 2, it is useful to illustrate the impact that alternative districting plans or types of districts typically have on the likelihood that a minority group will be able to elect candidates it prefers, and then to set out the critical elements of a vote dilution claim as they emerge in the Court's opinion.

Consider a town of 1,000 voters that is governed by a council of four representatives, in which 30% of the voters are black, and in which the black voters are concentrated in one section of the city and tend to vote as a bloc. It would be possible to draw four single-member districts, in one of which blacks would constitute an overwhelming majority. The black voters in this district would be assured of electing a representative of their choice, while any remaining black voters in the other districts would be submerged in large white majorities. This option would give the minority group roughly proportional representation.

Alternatively, it would usually be possible to draw four single-member districts in *two* of which black voters constituted much narrower majorities of about 60%. The black

voters in these districts would often be able to elect the representative of their choice in each of these two districts, but if even 20% of the black voters supported the candidate favored by the white minority in those districts the candidates preferred by the majority of black voters might lose. This option would, depending on the circumstances of a particular election, sometimes give the minority group more than proportional representation, but would increase the risk that the group would not achieve even roughly proportional representation.

It would also usually be possible to draw four single-member districts in each of which black voters constituted a minority. In the extreme case, black voters would constitute 30% of the voters in each district. Unless approximately 30% of the white voters in this extreme case backed the minority candidate, black voters in such a district would be unable to elect the candidate of their choice in an election between only two candidates even if they unanimously supported him. This option would make it difficult for black voters to elect candidates of their choice even with significant white support, and all but impossible without such support.

Finally, it would be possible to elect all four representatives in a single at-large election in which each voter could vote for four candidates. Under this scheme, white voters could elect all the representatives even if black voters turned out in large numbers and voted for one and only one candidate. To illustrate, if only four white candidates ran, and each received approximately equal support from white voters, each would receive about 700 votes, whereas black voters could cast no more than 300 votes for any one candidate. If, on the other hand, eight white candidates ran, and white votes were distributed less evenly, so that the five least favored white candidates received fewer than 300 votes while three others received 400 or more, it would be feasible for blacks to elect one representative with 300 votes even without substantial white support. If even 25% of the white vot-

ers backed a particular minority candidate, and black voters voted only for that candidate, the candidate would receive a total of 475 votes, which would ensure victory unless white voters also concentrated their votes on four of the eight remaining candidates, so that each received the support of almost 70% of white voters. As these variations show, the at-large or multimember district has an inherent tendency to submerge the votes of the minority. The minority group's prospects for electoral success under such a district heavily depend on a variety of factors such as voter turnout, how many candidates run, how evenly white support is spread, how much white support is given to a candidate or candidates preferred by the minority group, and the extent to which minority voters engage in "bullet voting" (which occurs when voters refrain from casting all their votes to avoid the risk that by voting for their lower ranked choices they may give those candidates enough votes to defeat their higher ranked choices, see *ante*, at 38–39, n. 5).

There is no difference in principle between the varying effects of the alternatives outlined above and the varying effects of alternative single-district plans and multimember districts. The type of districting selected and the way in which district lines are drawn can have a powerful effect on the likelihood that members of a geographically and politically cohesive minority group will be able to elect candidates of their choice.

Although § 2 does not speak in terms of "vote dilution," I agree with the Court that proof of vote dilution can establish a violation of § 2 as amended. The phrase "vote dilution," in the legal sense, simply refers to the impermissible discriminatory effect that a multimember or other districting plan has when it operates "to cancel out or minimize the voting strength of racial groups." *White*, 412 U. S., at 765. See also *Fortson v. Dorsey*, 379 U. S. 433, 439 (1965). This definition, however, conceals some very formidable difficulties. Is the "voting strength" of a racial group to be assessed solely

with reference to its prospects for electoral success, or should courts look at other avenues of political influence open to the racial group? Insofar as minority voting strength is assessed with reference to electoral success, how should undiluted minority voting strength be measured? How much of an impairment of minority voting strength is necessary to prove a violation of § 2? What constitutes racial bloc voting and how is it proved? What weight is to be given to evidence of actual electoral success by minority candidates in the face of evidence of racial bloc voting?

The Court resolves the first question summarily: minority voting strength *is* to be assessed solely in terms of the minority group's ability to elect candidates it prefers. *Ante,* at 48–49, n. 15. Under this approach, the essence of a vote dilution claim is that the State has created single-member or multimember districts that unacceptably impair the minority group's ability to elect the candidates its members prefer.

In order to evaluate a claim that a particular multimember district or single-member district has diluted the minority group's voting strength to a degree that violates § 2, however, it is also necessary to construct a measure of "undiluted" minority voting strength. "[T]he phrase [vote dilution] itself suggests a norm with respect to which the fact of dilution may be ascertained." *Mississippi Republican Executive Committee* v. *Brooks,* 469 U. S. 1002, 1012 (1984) (REHNQUIST, J., dissenting from summary affirmance). Put simply, in order to decide whether an electoral system has made it harder for minority voters to elect the candidates they prefer, a court must have an idea in mind of how hard it "should" be for minority voters to elect their preferred candidates under an acceptable system.

Several possible measures of "undiluted" minority voting strength suggest themselves. First, a court could simply use proportionality as its guide: if the minority group constituted 30% of the voters in a given area, the court would regard the minority group as having the potential to elect 30%

of the representatives in that area. Second, a court could posit some alternative districting plan as a "normal" or "fair" electoral scheme and attempt to calculate how many candidates preferred by the minority group would probably be elected under that scheme. There are, as we have seen, a variety of ways in which even single-member districts could be drawn, and each will present the minority group with its own array of electoral risks and benefits; the court might, therefore, consider a range of acceptable plans in attempting to estimate "undiluted" minority voting strength by this method. Third, the court could attempt to arrive at a plan that would maximize feasible minority electoral success, and use this degree of predicted success as its measure of "undiluted" minority voting strength. If a court were to employ this third alternative, it would often face hard choices about what would truly "maximize" minority electoral success. An example is the scenario described above, in which a minority group could be concentrated in one completely safe district or divided among two districts in each of which its members would constitute a somewhat precarious majority.

The Court today has adopted a variant of the third approach, to wit, undiluted minority voting strength means the maximum feasible minority voting strength. In explaining the elements of a vote dilution claim, the Court first states that "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Ante*, at 50. If not, apparently the minority group has no cognizable claim that its ability to elect the representatives of its choice has been impaired.[1] Second, "the minority group must be able

---

[1] I express no view as to whether the ability of a minority group to constitute a majority in a single-member district should constitute a threshold requirement for a claim that the use of multimember districts impairs the ability of minority voters to participate in the political processes and to elect representatives of their choice. Because the plaintiffs in this case would meet that requirement, if indeed it exists, I need not decide whether

to show that it is politically cohesive," that is, that a significant proportion of the minority group supports the same candidates. *Ante*, at 51. Third, the Court requires the minority group to "demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . —usually to defeat the minority's preferred candidate." *Ibid.* If these three requirements are met, "the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives." *Ibid.* That is to say, the minority group has proved vote dilution in violation of § 2.

The Court's definition of the elements of a vote dilution claim is simple and invariable: a court should calculate minority voting strength by assuming that the minority group is concentrated in a single-member district in which it constitutes a voting majority. Where the minority group is not large enough, geographically concentrated enough, or politically cohesive enough for this to be possible, the minority group's claim fails. Where the minority group meets these requirements, the representatives that it could elect in the hypothetical district or districts in which it constitutes a

it is imposed by § 2. I note, however, the artificiality of the Court's distinction between claims that a minority group's "ability *to elect* the representatives of [its] choice" has been impaired and claims that "its ability to *influence* elections" has been impaired. *Ante*, at 46–47, n. 12. It is true that a minority group that could constitute a majority in a single-member district ordinarily has the potential ability to elect representatives without white support, and that a minority that could not constitute such a majority ordinarily does not. But the Court recognizes that when the candidates preferred by a minority group are elected in a multimember district, the minority group has *elected* those candidates, even if white support was indispensable to these victories. On the same reasoning, if a minority group that is not large enough to constitute a voting majority in a single-member district can show that white support would probably be forthcoming in some such district to an extent that would enable the election of the candidates its members prefer, that minority group would appear to have demonstrated that, at least under this measure of its voting strength, it would be able to elect some candidates of its choice.

majority will serve as the measure of its undiluted voting strength. Whatever plan the State actually adopts must be assessed in terms of the effect it has on this undiluted voting strength. If this is indeed the single, universal standard for evaluating undiluted minority voting strength for vote dilution purposes, the standard is applicable whether what is challenged is a multimember district or a particular single-member districting scheme.

The Court's statement of the elements of a vote dilution claim also supplies an answer to another question posed above: *how much* of an impairment of undiluted minority voting strength is necessary to prove vote dilution. The Court requires the minority group that satisfies the threshold requirements of size and cohesiveness to prove that it will *usually* be unable to elect as many representatives of its choice under the challenged districting scheme as its undiluted voting strength would permit. This requirement, then, constitutes the true test of vote dilution. Again, no reason appears why this test would not be applicable to a vote dilution claim challenging single-member as well as multimember districts.

This measure of vote dilution, taken in conjunction with the Court's standard for measuring undiluted minority voting strength, creates what amounts to a right to *usual, roughly* proportional representation on the part of sizable, compact, cohesive minority groups. If, under a particular multimember or single-member district plan, qualified minority groups usually cannot elect the representatives they would be likely to elect under the most favorable single-member districting plan, then § 2 is violated. Unless minority success under the challenged electoral system regularly approximates this rough version of proportional representation, that system dilutes minority voting strength and violates § 2.

To appreciate the implications of this approach, it is useful to return to the illustration of a town with four council representatives given above. Under the Court's approach, if the

black voters who constitute 30% of the town's voting population do not usually succeed in electing one representative of their choice, then regardless of whether the town employs at-large elections or is divided into four single-member districts, its electoral system violates § 2. Moreover, if the town had a black voting population of 40%, on the Court's reasoning the black minority, so long as it was geographically and politically cohesive, would be entitled usually to elect two of the four representatives, since it would normally be possible to create two districts in which black voters constituted safe majorities of approximately 80%.

To be sure, the Court also requires that plaintiffs prove that racial bloc voting by the white majority interacts with the challenged districting plan so as usually to defeat the minority's preferred candidate. In fact, however, this requirement adds little that is not already contained in the Court's requirements that the minority group be politically cohesive and that its preferred candidates usually lose. As the Court acknowledges, under its approach, "in general, a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Ante*, at 56. But this is to define legally significant bloc voting by the racial majority in terms of the extent of the racial minority's electoral success. If the minority can prove that it could constitute a majority in a single-member district, that it supported certain candidates, and that those candidates have not usually been elected, then a finding that there is "legally significant white bloc voting" will necessarily follow. Otherwise, by definition, those candidates would usually have won rather than lost.

As shaped by the Court today, then, the basic contours of a vote dilution claim require no reference to most of the "*Zimmer* factors" that were developed by the Fifth Circuit to implement *White*'s results test and which were highlighted in the Senate Report. S. Rep., at 28–29; see *Zimmer* v. *Mc-*

*Keithen*, 485 F. 2d 1297 (1973) (en banc), aff'd *sub nom. East Carroll Parish School Board* v. *Marshall*, 424 U. S. 636 (1976) *(per curiam)*. If a minority group is politically and geographically cohesive and large enough to constitute a voting majority in one or more single-member districts, then unless white voters usually support the minority's preferred candidates in sufficient numbers to enable the minority group to elect as many of those candidates as it could elect in such hypothetical districts, it will routinely follow that a vote dilution claim can be made out, and the multimember district will be invalidated. There is simply no need for plaintiffs to establish "the history of voting-related discrimination in the State or political subdivision," *ante*, at 44, or "the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group," *ante*, at 45, or "the exclusion of members of the minority group from candidate slating processes," *ibid.*, or "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health," *ibid.*, or "the use of overt or subtle racial appeals in political campaigns," *ibid.*, or that "elected officials are unresponsive to the particularized needs of the members of the minority group." *Ibid.* Of course, these other factors may be supportive of such a claim, because they may strengthen a court's confidence that minority voters will be unable to overcome the relative disadvantage at which they are placed by a particular districting plan, or suggest a more general lack of opportunity to participate in the political process. But the fact remains that electoral success has now emerged, under the Court's standard, as the linchpin of vote dilution claims, and that the elements of a vote dilution claim create an entitlement to roughly proportional representation within the framework of single-member districts.

## II

In my view, the Court's test for measuring minority voting strength and its test for vote dilution, operating in tandem, come closer to an absolute requirement of proportional representation than Congress intended when it codified the results test in § 2. It is not necessary or appropriate to decide in this case whether § 2 requires a uniform measure of undiluted minority voting strength in every case, nor have appellants challenged the standard employed by the District Court for assessing undiluted minority voting strength.

In this case, the District Court seems to have taken an approach quite similar to the Court's in making its preliminary assessment of undiluted minority voting strength:

> "At the time of the creation of these multi-member districts, there were concentrations of black citizens within the boundaries of each that were sufficient in numbers and contiguity to constitute effective voting majorities in single-member districts lying wholly within the boundaries of the multi-member districts, which single-member districts would satisfy all constitutional requirements of population and geographical configuration." *Gingles* v. *Edmisten,* 590 F. Supp. 345, 358–359 (EDNC 1984).

The Court goes well beyond simply sustaining the District Court's decision to employ this measure of undiluted minority voting strength as a reasonable one that is consistent with § 2. In my view, we should refrain from deciding in this case whether a court must invariably posit as its measure of "undiluted" minority voting strength single-member districts in which minority group members constitute a majority. There is substantial doubt that Congress intended "undiluted minority voting strength" to mean "maximum feasible minority voting strength." Even if that is the appropriate definition in some circumstances, there is no indication that Congress intended to mandate a single, universally applicable

standard for measuring undiluted minority voting strength, regardless of local conditions and regardless of the extent of past discrimination against minority voters in a particular State or political subdivision. Since appellants have not raised the issue, I would assume that what the District Court did here was permissible under §2, and leave open the broader question whether §2 *requires* this approach.

What appellants *do* contest is the propriety of the District Court's standard for vote dilution. Appellants claim that the District Court held that "[a]lthough blacks had achieved considerable success in winning state legislative seats in the challenged districts, their failure to consistently attain the number of seats *that numbers alone would presumptively give them* (*i. e.*, in proportion to their presence in the population)," standing alone, constituted a violation of §2. Brief for Appellants 20 (emphasis in original). This holding, appellants argue, clearly contravenes §2's proviso that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U. S. C. §1973.

I believe appellants' characterization of the District Court's holding is incorrect. In my view, the District Court concluded that there was a severe diminution in the prospects for black electoral success in each of the challenged districts, as compared to single-member districts in which blacks could constitute a majority, and that this severe diminution was in large part attributable to the interaction of the multimember form of the district with persistent racial bloc voting on the part of the white majorities in those districts. See 590 F. Supp., at 372.[2] The District Court attached great weight

---

[2] At times, the District Court seems to have looked to simple proportionality rather than to hypothetical single-member districts in which black voters would constitute a majority. See, *e. g.*, 590 F. Supp., at 367. Nowhere in its opinion, however, did the District Court state that §2 requires that minority groups consistently attain the level of electoral success that would correspond with their proportion of the total or voting population.

to this circumstance as one part of its ultimate finding that "the creation of each of the multi-member districts challenged in this action results in the black registered voters of that district being submerged as a voting minority in the district and thereby having less opportunity than do other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.*, at 374. But the District Court's extensive opinion clearly relies as well on a variety of the other *Zimmer* factors, as the Court's thorough summary of the District Court's findings indicates. See *ante*, at 38–41.

If the District Court had held that the challenged multi-member districts violated § 2 solely because blacks had not consistently attained seats in proportion to their presence in the population, its holding would clearly have been inconsistent with § 2's disclaimer of a right to proportional representation. Surely Congress did not intend to say, on the one hand, that members of a protected class have no right to proportional representation, and on the other, that any consistent failure to achieve proportional representation, without more, violates § 2. A requirement that minority representation usually be proportional to the minority group's proportion in the population is not quite the same as a right to strict proportional representation, but it comes so close to such a right as to be inconsistent with § 2's disclaimer and with the results test that is codified in § 2. In the words of Senator Dole, the architect of the compromise that resulted in passage of the amendments to § 2:

"The language of the subsection explicitly rejects, as did *White* and its progeny, the notion that members of a protected class have a right to be elected in numbers equal to their proportion of the population. The extent to which members of a protected class have been elected under the challenged practice or structure is just one factor, among the totality of circumstances to be consid-

ered, and is not dispositive." S. Rep., at 194 (additional views of Sen. Dole).

On the same reasoning, I would reject the Court's test for vote dilution. The Court measures undiluted minority voting strength by reference to the possibility of creating single-member districts in which the minority group would constitute a majority, rather than by looking to raw proportionality alone. The Court's standard for vote dilution, when combined with its test for undiluted minority voting strength, makes actionable every deviation from usual, rough proportionality in representation for any cohesive minority group as to which this degree of proportionality is feasible within the framework of single-member districts. Requiring that every minority group that could possibly constitute a majority in a single-member district be assigned to such a district would approach a requirement of proportional representation as nearly as is possible within the framework of single-member districts. Since the Court's analysis entitles every such minority group usually to elect as many representatives under a multimember district as it could elect under the most favorable single-member district scheme, it follows that the Court is requiring a form of proportional representation. This approach is inconsistent with the results test and with § 2's disclaimer of a right to proportional representation.

In enacting § 2, Congress codified the "results" test this Court had employed, as an interpretation of the Fourteenth Amendment, in *White* and *Whitcomb*. The factors developed by the Fifth Circuit and relied on by the Senate Report simply fill in the contours of the "results" test as described in those decisions, and do not purport to redefine or alter the ultimate showing of discriminatory effect required by *Whitcomb* and *White*. In my view, therefore, it is to *Whitcomb* and *White* that we should look in the first instance in determining how great an impairment of minority voting strength is required to establish vote dilution in violation of § 2.

The "results" test as reflected in *Whitcomb* and *White* requires an inquiry into the extent of the minority group's opportunities to participate in the political processes. See *White*, 412 U. S., at 766. While electoral success is a central part of the vote dilution inquiry, *White* held that to prove vote dilution, "it is not enough that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential," *id.*, at 765–766, and *Whitcomb* flatly rejected the proposition that "any group with distinctive interests must be represented in legislative halls if it is numerous enough to command at least one seat and represents a majority living in an area sufficiently compact to constitute a single member district." 403 U. S., at 156. To the contrary, the results test as described in *White* requires plaintiffs to establish "that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." 412 U. S., at 766. By showing both "a history of disproportionate results" and "strong indicia of lack of political power and the denial of fair representation," the plaintiffs in *White* met this standard, which, as emphasized just today, requires "a substantially greater showing of adverse effects than a mere lack of proportional representation to support a finding of unconstitutional vote dilution." *Davis* v. *Bandemer, post,* at 131 (plurality opinion).

When Congress amended § 2 it intended to adopt this "results" test, while abandoning the additional showing of discriminatory intent required by *Bolden*. The vote dilution analysis adopted by the Court today clearly bears little resemblance to the "results" test that emerged in *Whitcomb* and *White*. The Court's test for vote dilution, combined with its standard for evaluating "voting potential," *White, supra*, at 766, means that any racial minority with distinctive interests must *usually* "be represented in legislative halls if

it is numerous enough to command at least one seat and represents a minority living in an area sufficiently compact to constitute" a voting majority in "a single member district." *Whitcomb*, 403 U. S., at 156. Nothing in *Whitcomb, White,* or the language and legislative history of § 2 supports the Court's creation of this right to usual, roughly proportional representation on the part of every geographically compact, politically cohesive minority group that is large enough to form a majority in one or more single-member districts.

I would adhere to the approach outlined in *Whitcomb* and *White* and followed, with some elaboration, in *Zimmer* and other cases in the Courts of Appeals prior to *Bolden*. Under that approach, a court should consider all relevant factors bearing on whether the minority group has "less opportunity than other members of the electorate to participate in the political process *and* to elect representatives of their choice." 42 U. S. C. § 1973 (emphasis added). The court should not focus solely on the minority group's ability to elect representatives of its choice. Whatever measure of undiluted minority voting strength the court employs in connection with evaluating the presence or absence of minority electoral success, it should also bear in mind that "the power to influence the political process is not limited to winning elections." *Davis* v. *Bandemer, post,* at 132. Of course, the relative lack of minority electoral success under a challenged plan, when compared with the success that would be predicted under the measure of undiluted minority voting strength the court is employing, can constitute powerful evidence of vote dilution. Moreover, the minority group may in fact lack access to or influence upon representatives it did not support as candidates. Cf. *Davis* v. *Bandemer, post,* at 169–170 (POWELL, J., concurring in part and dissenting in part). Nonetheless, a reviewing court should be required to find more than simply that the minority group does not usually attain an undiluted measure of electoral success. The court must find that even substantial minority success will be highly infrequent

under the challenged plan before it may conclude, on this basis alone, that the plan operates "to cancel out or minimize the voting strength of [the] racial grou[p]." *White, supra,* at 765.

## III

Only three Justices of the Court join Part III–C of JUS-TICE BRENNAN's opinion, which addresses the validity of the statistical evidence on which the District Court relied in finding racially polarized voting in each of the challenged districts. Insofar as statistical evidence of divergent racial voting patterns is admitted solely to establish that the minority group is politically cohesive and to assess its prospects for electoral success, I agree that defendants cannot rebut this showing by offering evidence that the divergent racial voting patterns may be explained in part by causes other than race, such as an underlying divergence in the interests of minority and white voters. I do not agree, however, that such evidence can never affect the overall vote dilution inquiry. Evidence that a candidate preferred by the minority group in a particular election was rejected by white voters for reasons other than those which made that candidate the preferred choice of the minority group would seem clearly relevant in answering the question whether bloc voting by white voters will consistently defeat minority candidates. Such evidence would suggest that another candidate, equally preferred by the minority group, might be able to attract greater white support in future elections.

I believe Congress also intended that explanations of the reasons why white voters rejected minority candidates would be probative of the likelihood that candidates elected without decisive minority support would be willing to take the minority's interests into account. In a community that is polarized along racial lines, racial hostility may bar these and other indirect avenues of political influence to a much greater extent than in a community where racial animosity is absent although the interests of racial groups diverge. Indeed, the

Senate Report clearly stated that one factor that could have probative value in §2 cases was "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." S. Rep., at 29. The overall vote dilution inquiry neither requires nor permits an arbitrary rule against consideration of all evidence concerning voting preferences other than statistical evidence of racial voting patterns. Such a rule would give no effect whatever to the Senate Report's repeated emphasis on "intensive racial politics," on "racial political considerations," and on whether "racial politics . . . dominate the electoral process" as one aspect of the "racial bloc voting" that Congress deemed relevant to showing a §2 violation. *Id.*, at 33–34. Similarly, I agree with JUSTICE WHITE that JUSTICE BRENNAN's conclusion that the race of the candidate is always irrelevant in identifying racially polarized voting conflicts with *Whitcomb* and is not necessary to the disposition of this case. *Ante*, at 83 (concurring).

In this case, as the Court grudgingly acknowledges, the District Court clearly erred in *aggregating* data from all of the challenged districts, and then relying on the fact that on average, 81.7% of white voters did not vote for any black candidate in the primary elections selected for study. *Ante*, at 59–60, n. 28. Although Senate District 22 encompasses House District 36, with that exception the districts at issue in this case are distributed throughout the State of North Carolina. *White* calls for "an intensely local appraisal of the design and impact of the . . . multimember district," 412 U. S., at 769–770, and racial voting statistics from one district are ordinarily irrelevant in assessing the totality of the circumstances in another district. In view of the specific evidence from each district that the District Court also considered, however, I cannot say that its conclusion that there was severe racial bloc voting was clearly erroneous with regard to any of the challenged districts. Except in House District 23, where racial bloc voting did not prevent sustained and virtu-

ally proportional minority electoral success, I would accordingly leave undisturbed the District Court's decision to give great weight to racial bloc voting in each of the challenged districts.

## IV

Having made usual, roughly proportional success the sole focus of its vote dilution analysis, the Court goes on to hold that proof that an occasional minority candidate has been elected does not foreclose a § 2 claim. But JUSTICE BRENNAN, joined by JUSTICE WHITE, concludes that "persistent proportional representation" will foreclose a § 2 claim unless the plaintiffs prove that this "sustained success does not accurately reflect the minority group's ability to elect its preferred representatives." *Ante,* at 77. I agree with JUSTICE BRENNAN that consistent and sustained success by candidates preferred by minority voters is presumptively inconsistent with the existence of a § 2 violation. Moreover, I agree that this case presents no occasion for determining what would constitute proof that such success did not accurately reflect the minority group's actual voting strength in a challenged district or districts.

In my view, the District Court erred in assessing the extent of black electoral success in House District 39 and Senate District 22, as well as in House District 23, where the Court acknowledges error. As the evidence summarized by the Court in table form shows, *ante,* at 82, Appendix B, the degree of black electoral success differed widely in the seven originally contested districts. In House District 8 and Senate District 2, neither of which is contested in this Court, no black candidate had ever been elected to the offices in question. In House District 21 and House District 36, the only instances of black electoral success came in the two most recent elections, one of which took place during the pendency of this litigation. By contrast, in House District 39 and Senate District 22, black successes, although intermittent, dated back to 1974, and a black candidate had been elected in each

of these districts in three of the last five elections. Finally, in House District 23 a black candidate had been elected in each of the last six elections.

The District Court, drawing no distinctions among these districts for purposes of its findings, concluded that "[t]he overall results achieved to date at all levels of elective office are minimal in relation to the percentage of blacks in the total population." 590 F. Supp., at 367. The District Court clearly erred to the extent that it considered electoral success in the aggregate, rather than in each of the challenged districts, since, as the Court states, "[t]he inquiry into the existence of vote dilution . . . is district-specific." *Ante*, at 59, n. 28. The Court asserts that the District Court was free to regard the results of the 1982 elections with suspicion and to decide "on the basis of all the relevant circumstances to accord greater weight to blacks' relative lack of success over the course of several recent elections," *ante*, at 76, but the Court does not explain how this technique would apply in Senate District 22, where a black candidate was elected in three consecutive elections from 1974 to 1978, but no black candidate was elected in 1982, or in House District 39, where black candidates were elected in 1974 and 1976 as well as in 1982. Contrary to what the District Court thought, see 590 F. Supp., at 367, these pre-1982 successes, which were proportional or nearly proportional to black population in these three multimember districts, certainly lend *some* support for a finding that black voters in these districts enjoy an equal opportunity to participate in the political process and to elect representatives of their choice.

Despite this error, I agree with the Court's conclusion that, except in House District 23, minority electoral success was not sufficiently frequent to compel a finding of equal opportunity to participate and elect. The District Court found that "in each of the challenged districts racial polarization in voting presently exists to a substantial or severe degree, and . . . in each district it presently operates to

minimize the voting strength of black voters." *Id.*, at 372. I cannot say that this finding was clearly erroneous with respect to House District 39 or Senate District 22, particularly when taken together with the District Court's findings concerning the other *Zimmer* factors, and hence that court's ultimate conclusion of vote dilution in these districts is adequately supported.

This finding, however, is clearly erroneous with respect to House District 23. Blacks constitute 36.3% of the population in that district and 28.6% of the registered voters. In each of the six elections since 1970 one of the three representatives from this district has been a black. There is no finding, or any reason even to suspect, that the successful black candidates in District 23 did not in fact represent the interests of black voters, and the District Court did not find that black success in previous elections was aberrant.

*Zimmer*'s caveat against *necessarily* foreclosing a vote dilution claim on the basis of isolated black successes, 485 F. 2d, at 1307; see S. Rep., at 29, n. 115, cannot be pressed this far. Indeed, the 23 Court of Appeals decisions on which the Senate Report relied, and which are the best evidence of the scope of this caveat, contain no example of minority electoral success that even remotely approximates the consistent, decade-long pattern in District 23. See, *e. g., Turner* v. *McKeithen,* 490 F. 2d 191 (CA5 1973) (no black candidates elected); *Wallace* v. *House,* 515 F. 2d 619 (CA5 1975) (one black candidate elected), vacated on other grounds, 425 U. S. 947 (1976).

I do not propose that consistent and virtually proportional minority electoral success should always, as a matter of law, bar finding a § 2 violation. But, as a general rule, such success is entitled to great weight in evaluating whether a challenged electoral mechanism has, on the totality of the circumstances, operated to deny black voters an equal opportunity to participate in the political process and to elect representatives of their choice. With respect to House District 23, the District Court's failure to accord black electoral success such

weight was clearly erroneous, and the District Court identified no reason for not giving this degree of success preclusive effect. Accordingly, I agree with JUSTICE BRENNAN that appellees failed to establish a violation of § 2 in District 23.

V

When members of a racial minority challenge a multimember district on the grounds that it dilutes their voting strength, I agree with the Court that they must show that they possess such strength and that the multimember district impairs it. A court must therefore appraise the minority group's undiluted voting strength in order to assess the effects of the multimember district. I would reserve the question of the proper method or methods for making this assessment. But once such an assessment is made, in my view the evaluation of an alleged impairment of voting strength requires consideration of the minority group's access to the political processes generally, not solely consideration of the chances that its preferred candidates will actually be elected. Proof that white voters withhold their support from minority-preferred candidates to an extent that consistently ensures their defeat is entitled to significant weight in plaintiffs' favor. However, if plaintiffs direct their proof solely towards the minority group's prospects for electoral success, they must show that substantial minority success will be highly infrequent under the challenged plan in order to establish that the plan operates to "cancel out or minimize" their voting strength. *White,* 412 U. S., at 765.

Compromise is essential to much if not most major federal legislation, and confidence that the federal courts will enforce such compromises is indispensable to their creation. I believe that the Court today strikes a different balance than Congress intended to when it codified the results test and disclaimed any right to proportional representation under § 2. For that reason, I join the Court's judgment but not its opinion.

JUSTICE STEVENS, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring in part and dissenting in part.

In my opinion, the findings of the District Court, which the Court fairly summarizes, *ante*, at 37–41, 52–54, and n. 23, 59–61, and nn. 28 and 29, adequately support the District Court's judgment concerning House District 23 as well as the balance of that judgment.

I, of course, agree that the election of one black candidate in each election since 1972 provides significant support for the State's position. The notion that this evidence creates some sort of a conclusive, legal presumption, *ante*, at 75–76, is not, however, supported by the language of the statute or by its legislative history.[1] I therefore cannot agree with the Court's view that the District Court committed error by failing to apply a rule of law that emerges today without statutory support. The evidence of candidate success in District 23 is merely one part of an extremely large record which the District Court carefully considered before making its ultimate findings of fact, all of which should be upheld under a normal application of the "clearly erroneous" standard that the Court traditionally applies.[2]

The Court identifies the reason why the success of one black candidate in the elections in 1978, 1980, and 1982 is not

---

[1] See *ante*, at 75 ("Section 2(b) provides that '[t]he extent to which members of a protected class have been elected to office . . . is one circumstance which may be considered.' 42 U. S. C. § 1973(b). . . . However, the Senate Report expressly states that 'the election of a few minority candidates does not "necessarily foreclose the possibility of dilution of the black vote,"' noting that if it did, 'the possibility exists that the majority citizens might evade [§ 2] by manipulating the election of a "safe" minority candidate.' . . . The Senate Committee decided, instead, to '"require an independent consideration of the record"'") (internal citations omitted).

[2] See *ante*, at 79 ("[T]he application of the clearly-erroneous standard to ultimate findings of vote dilution preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law").

inconsistent with the District Court's ultimate finding concerning House District 23.[3] The fact that one black candidate was also elected in the 1972, 1974, and 1976 elections, *ante*, at 82, Appendix B, is not sufficient, in my opinion, to overcome the additional findings that apply to House District 23, as well as to other districts in the State for each of those years. The Court accurately summarizes those findings:

> "The District Court in this case carefully considered the totality of the circumstances and found that in each district racially polarized voting; the legacy of official discrimination in voting matters, education, housing, employment, and health services; and the persistence of campaign appeals to racial prejudice acted in concert with the multimember districting scheme to impair the ability of geographically insular and politically cohesive groups of black voters to participate equally in the political process and to elect candidates of their choice. It found that the success a few black candidates have enjoyed in these districts is too recent, too limited, and, with regard to the 1982 elections, perhaps too aberrational, to disprove its conclusion." *Ante*, at 80.

To paraphrase the Court's conclusion about the other districts, *ibid.*, I cannot say that the District Court, composed of local judges who are well acquainted with the political realities of the State, clearly erred in concluding that use of a multimember electoral structure has caused black voters in House District 23 to have less opportunity than white voters to elect representatives of their choice.[4] Accordingly, I con-

---

[3] See *ante*, at 52–54, and n. 23, 60, n. 29, 75–76.

[4] Even under the Court's analysis, the decision simply to reverse—without a remand—is mystifying. It is also extremely unfair. First, the Court does not give appellees an opportunity to address the new legal standard that the Court finds decisive. Second, the Court does not even bother to explain the contours of that standard, and why it was not satisfied in this case. Cf. *ante*, at 77, n. 38 ("We have no occasion in this case

cur in the Court's opinion except Part IV–B and except insofar as it explains why it reverses the judgment respecting House District 23.

to decide what types of special circumstances could satisfactorily demonstrate that sustained success does not accurately reflect the minority's ability to elect its preferred representatives"). Finally, though couched as a conclusion about a "matter of law," *ante*, at 77, the Court's abrupt entry of judgment for appellants on District 23 reflects an unwillingness to give the District Court the respect it is due, particularly when, as in this case, the District Court has a demonstrated knowledge and expertise of the entire context that Congress directed it to consider.