Justice Breyer,
dissenting.
I join Justice Souter’s opinion in full. I write separately in light of the plurality’s claim that a bright-line 50% rule (used as a Thornburg v. Gingles, 478 U. S. 30 (1986), gateway) serves administrative objectives. In the plurality’s view, that rule amounts to a relatively simple administrative device that will help separate at the outset those cases that are more likely meritorious from those that are not. Even were that objective as critically important as the plurality believes, however, it is not difficult to find other numerical gateway rules that would work better.
Assume that a basic purpose of a gateway number is to separate (1) districts where a minority group can “elect representatives of their choice,” from (2) districts where the minority, because of the need to obtain majority crossover votes, can only “elect representatives” that are consensus candidates. 42 U. S. C. § 1973(b) (2000 ed.); League of *45 United Latin American Citizens v. Perry, 548 U. S. 399, 445 (2006) (plurality opinion). At first blush, one might think that a 50% rule will work in this respect. After all, if a 50% minority population votes as a bloc, can it not always elect the candidate of its choice? And if a minority population constitutes less than 50% of a district, is not any candidate elected from that district always a consensus choice of minority and majority voters? The realities of voting behavior, however, make clear that the answer to both these questions is “no.” See, e. g., Brief for Nathaniel Persily et al. as Amici Curiae 5-6 (“Fifty percent is seen as a magic number by some because under conditions of complete racial polarization and equal rates of voting eligibility, registration, and turnout, the minority community will be able to elect its candidate of choice. In practice, such extreme conditions are never present. . . . [S]ome districts must be more than 50% minority, while others can be less than 50% minority, in order for the minority community to have an equal opportunity to elect its candidate of choice” (emphasis added)); see also ante, at 32-33 (Souter, J., dissenting).
No voting group is 100% cohesive. Except in districts with overwhelming minority populations, some crossover votes are often necessary. The question is how likely it is that the need for crossover votes will force a minority to reject its “preferred choice” in favor of a “consensus candidate.” A 50% number does not even try to answer that question. To the contrary, it includes, say, 51% minority districts, where imperfect cohesion may, in context, prevent election of the “minority-preferred” candidate, while it excludes, say, 45% districts where a smaller but more cohesive minority can, with the help of a small and reliable majority crossover vote, elect its preferred candidate.
Why not use a numerical gateway rule that looks more directly at the relevant question: Is the minority bloc large enough, is it cohesive enough, is the necessary majority crossover vote small enough, so that the minority (tending *46 to vote cohesively) can likely vote its preferred candidate (rather than a consensus candidate) into office? See ante, at 33 (Souter, J., dissenting) (“[Ejmpirical studies confir[m] that. . . minority groups” constituting less than 50% of the voting population “regularly elect their preferred candidates with the help of modest crossover by members of the majority”); see also Pildes, Is Voting-Rights Law Now at War With Itself? Social Science and Voting Rights in the 2000s, 80 N. C. L. Rev. 1517, 1529-1535 (2002) (reviewing studies showing small but reliable crossover voting by whites in districts where minority voters have demonstrated the ability to elect their preferred candidates without constituting 50% of the population in that district). We can likely find a reasonably administrable mathematical formula more directly tied to the factors in question.
To take a possible example: Suppose we pick a numerical ratio that requires the minority voting age population to be twice as large as the percentage of majority crossover votes needed to elect the minority’s preferred candidate. We would calculate the latter (the percentage of majority crossover votes the minority voters need) to take account of both the percentage of minority voting age population in the district and the cohesiveness with which they vote. Thus, if minority voters account for 45% of the voters in a district and 89% of those voters tend to vote cohesively as a group, then the minority needs a crossover vote of about 20% of the majority voters to elect its preferred candidate. (Such a district with 100 voters would have 45 minority voters and 55 majority voters; 40 minority voters would vote for the minority group’s preferred candidate at election time; the minority voters would need 11 more votes to elect their preferred candidate; and 11 is about 20% of the majority’s 55.) The larger the minority population, the greater its cohesiveness, and thus the smaller the crossover vote needed to assure success, the greater the likelihood that the minority can *47 elect its preferred candidate and the smaller the likelihood that the cohesive minority, in order to find the needed majority crossover vote, must support a consensus, rather than its preferred, candidate.
In reflecting the reality that minority voters can elect the candidate of their choice when they constitute less than 50% of a district by relying on a small majority crossover vote, this approach is in no way contradictory to, or even in tension with, the third Gingles requirement. Since Gingles itself, we have acknowledged that the requirement of majority-bloc voting can be satisfied even when some small number of majority voters cross over to support a minority-preferred candidate. See 478 U. S., at 59 (finding majority-bloc voting where the majority group supported African-American candidates in the general election at a rate of between 26% and 49%, with an average support of one-third). Given the difficulty of obtaining totally accurate statistics about cohesion, or even voting age population, the district courts should administer the numerical ratio flexibly, opening (or closing) the Gingles gate (in light of the probable merits of a case) where only small variances are at issue (e. g., where the minority group is 39% instead of 40% of a district). But the same is true with a 50% number (e. g., where the minority group is 49% instead of 50% of a district). See, e. g., Brief for United States as Amicus Curiae 15.
I do not claim that the 2-to-l ratio is a perfect rule; I claim only that it is better than the plurality’s 50% rule. After all, unlike 50%, a 2-to-l ratio (of voting age minority population to necessary nonminority crossover votes) focuses directly upon the problem at hand, better reflects voting realities, and consequently far better separates at the gateway likely sheep from likely goats. See Gingles, supra, at 45 (The §2 inquiry depends on a “ ‘functional’ view of the political process” and “‘a searching practical evaluation of the past and present reality’ ” (quoting S. Rep. No. 97-417, p. 30, and n. 120 (1982))); Gingles, supra, at 94-95 (O’Connor, J., *48 concurring in judgment) (“[Tjhere is no indication that Congress intended to mandate a single, universally applicable standard for measuring undiluted minority voting strength, regardless of local conditions ... ”). In most cases, the 50% rule and the 2-to-l rule would have roughly similar effects. Most districts where the minority voting age population is greater than 50% will almost always satisfy the 2-to-l rule; and most districts where the minority population is below 40% will almost never satisfy the 2-to-l rule. But in districts with minority voting age populations that range from 40% to 50%, the divergent approaches of the two standards can make a critical difference — as well they should.
In a word, Justice Soutek well explains why the majority’s test is ill suited to the statute’s objectives. I add that the test the majority adopts is ill suited to its own administrative ends. Better gateway tests, if needed, can be found.
With respect, I dissent.