PREGERSON, Circuit Judge,
concurring in part and dissenting in part:
I agree with the majority that Proposition 200’s registration provision violates the National Voter Registration Act (“NVRA”). See Maj. Op. at 403. I part ways with the majority, however, when it comes to Proposition 200’s requirement that voters provide identification at the polls (“the polling place provision”). The majority concludes that Gonzalez’s challenge to the polling place provision under Section 2 of the Voting Rights Act fails because Gonzalez has not established that the polling place provision “results in discrimination on account of race.” Maj. Op. at 405. I respectfully disagree with the majority, for two reasons.
First, in concluding that Proposition 200’s polling place provision does not disparately impact Latino voters, the majority conflates statistics on Proposition 200’s registration provision with Proposition 200’s polling place provision. See Maj. Op. at 405-06. A thorough review of the record reveals that Proposition 200’s polling place provision has a significant disproportionate impact on Latino voters. In the 2006 general election, Latino voters *443 comprised between 2.6% and 4.2% of the voters who turned out to vote, but Latino voters cast 10.3% of the ballots that went uncounted because of insufficient identification. Latino voters were overrepresented by 200% to 500% in ballots that were uncounted because of insufficient identification.
Second, the majority mistakenly gives short shrift to the “Senate Factors” from Thornburg v. Gingles, 478 U.S. 30, 44, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).[1] In discussing these factors, the majority acknowledges that Latino voters have “suffered a history of discrimination in Arizona that hindered their ability to participate in the political process fully, that there were socioeconomic disparities between Latinos and whites in Arizona, and that Arizona continues to have some degree of racially polarized voting.” Maj. Op. at 406. Despite acknowledging these facts, the majority concludes that Proposition 200’s polling place provision does not result “in discrimination on account of race.” Maj. Op. at 405. But a proper Section 2 analysis requires that we “consider how the challenged practice ‘interacts with social and historical conditions’ ” to cause an inequality in the opportunities of Latino voters to cast their ballots. Farrakhan v. Washington, 338 F.3d 1009, 1016 (9th Cir.2003) (quoting Gingles, 478 U.S. at 47, 106 S.Ct. 2752).
Indeed, as the district court recounted in much detail, de jure discrimination against Latinos in Arizona existed during most of the twentieth century. Just prior to 1910, Arizona voters passed a literacy law that explicitly targeted Mexicans and disqualified non-English speakers from voting in state elections. As late as the 1960s, these literacy requirements were a precondition for voting in Arizona.
After Arizona attained statehood in 1912, the new state government engaged in an anti-immigrant campaign characterized by a series of proposals aimed at restricting the political rights of Mexican immigrants’ and limiting their right to work. The new Arizona constitution restricted non-citizens from working on public projects. In 1914, the Arizona legislature enacted the “eighty percent law,” which stated that eighty percent of the employees in businesses that had five or more employees had to be “native-born citizens of the United States.”
Segregation of Latinos in housing and public accommodations was also common in Arizona during most of the twentieth century. In the years immediately following World War II, the city of Phoenix segregated Latino veterans in separate housing units. Movie theaters, restaurants, and stores frequently excluded Lati *444 nos or required Latinos to sit in segregated areas. Public parks and swimming pools were also segregated. A particularly notorious example of this segregation occurred in Tempe, where Latinos were only permitted to use the public swimming pool the day before the pool was drained.
In my view, statistics showing that Proposition 200’s polling place provision disparately impact Latino voters, when coupled with Arizona’s long history of discrimination against Latinos, current socioeconomic disparities between Latinos and whites in Arizona, and racially polarized voting in Arizona, establish that Proposition 200’s polling place provision results in discrimination on account of race.
History has also shown that when a Latino voter approaches the polling place but is stopped by a person perceived to be an authority figure checking for identification, there’s something intimidating about that experience that evokes fear of discrimination. This intimidation has the effect of keeping Latino voters away from the polls.
In sum, I would hold that Proposition 200’s polling place provision results in discrimination on account of race, in violation of Section 2 of the Voting Rights Act.

. In Gingles the Supreme Court held that a court should consider the following factors, commonly referred to as the "Senate Factors,” in determining whether a plaintiff has established a violation of Section 2 of the Voting Rights Act:
[T]he histoiy of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.
Gingles, 478 U.S. at 44-45, 106 S.Ct. 2752.